**AMERICAN CAN COMPANY,**
**Plaintiff-Appellee,**

v.

**Ishwar MANSUKHANI, d/b/a Brand Associates, and Ruth Brand, d/b/a Brand Associates, and Brand M, Inc., Defendants-Appellants.**

**No. 83–2553.**

United States Court of Appeals,
Seventh Circuit.

Argued March 28, 1984.

Decided July 30, 1984.

Amended Aug. 10, 1984.

Rehearing and Rehearing En Banc
Denied Oct. 22, 1984.

Andrew O. Riteris, Michael, Best & Friedrich, Milwaukee, Wis., for defendants-appellants.

Douglas W. Wyatt, Wyatt, Gerber, Shoup, Scobey & Badie, New York City, for plaintiff-appellee.

Before WOOD, CUDAHY and FLAUM, Circuit Judges.

CUDAHY, Circuit Judge.

This is an appeal from the district court's preliminary injunction enjoining defendants from taking actions which might constitute misappropriation of plaintiff's trade secrets. The appeal presents several important procedural issues involving the use of ex parte temporary restraining orders in trade secret cases. The appeal also involves the scope and necessary precision of injunctive relief in trade secret cases. At the heart of the case is the problem that courts face in framing orders to prevent defendants from competing unfairly by using another's trade secrets while still permitting defendants to compete fairly using public information and their own talents and experience.

## I

## FACTS

Plaintiff-appellee American Can Company ("American Can") develops, manufactures and sells commercial jet inks. Commercial jet inks are sprayed onto a printing surface without direct contact, and they are therefore useful for printing on delicate surfaces or other surfaces for which contact printing is unsuitable. For example, some of the commercial jet inks involved in this case are used to print date codes on aluminum beer cans or to print on plastic antifreeze jugs.

Defendants-appellants are Ishwar Mansukhani, his wife, Ruth Brand, and their businesses, Brand Associates and Brand M, Inc. Mansukhani is an experienced ink chemist, and his wife is also a physical chemist, although she had no experience with inks until she and her husband started their businesses in late 1980.

The relationship between plaintiff and defendants goes back to August 1976. At that time, American Can had a wholly owned subsidiary called M & T Chemicals, Inc. ("M & T"), which was engaged in the commercial jet ink business. M & T hired Mansukhani as a chemist; at that time, he was experienced in ink chemistry but had had no experience with jet inks. He signed an agreement with M & T promising not to use its trade secrets and to return all documents at the end of his employment. Mansukhani began to develop commercial jet inks, and he invented numerous inks. Over the next several years, Mansukhani continued to work at the same laboratory, but the identity of his employer changed several times. In August 1977, American Can sold M & T to Axco Industries, Inc., and in August 1979, Axco sold M & T to Whittaker Corporation. Then, in October 1980, Whittaker sold the assets and rights pertaining to the jet ink business back to American Can. (For the sake of simplicity, we shall generally refer to all of Mansukhani's employers as "American Can" or

"the plaintiff.") When American Can took over the business, it asked Mansukhani to stay on the job, but he declined the offer. Instead, he and his wife started their own commercial jet ink business in December 1980. They began to sell commercial jet inks to several of American Can's customers at substantially lower prices than American Can was offering.

American Can filed its original complaint in this action on October 23, 1981. Federal jurisdiction is based on diversity of citizenship. The complaint charged that Mansukhani was competing unfairly by misappropriating plaintiff's trade secrets. After a trial in March 1982, the district court found that Mansukhani had violated the confidentiality agreement by taking with him copies of patent applications, ink formulas and other documents when he left his old job. The district court also found that Mansukhani had contacted several former customers of Whittaker and had sold jet inks to them for substantially lower prices. Mansukhani had had access to information needed to formulate inks suitable for those customers' specific needs, and the inks Mansukhani had sold were precisely identical to the "400 Series" inks he had helped to develop for plaintiff. Applying Wisconsin trade secret law,[1] the court found that the formulas for the 400 Series inks were trade secrets and that defendants had misappropriated those secrets. The court entered a permanent injunction on June 18, 1982. *American Can Co. v. Mansukhani,* 216 U.S.P.Q. (BNA) 1094 (E.D.Wis.1982). The relevant, operative terms of the injunction permanently enjoined defendants from

> selling *the commercial jet inks developed while Mansukhani was employed by plaintiff's predecessors* to the companies or individuals for whom those inks were specifically developed, or to any other companies or individuals.

216 U.S.P.Q. at 1100 (emphasis supplied). The defendants later asked the court to clarify that order. They asked whether the

---

**1.** Wisconsin, together with many other states, has approved the statement of trade secret law in Restatement of Torts § 757 (1939), and the accompanying comments. *Abbott Laboratories v. Norse Chemical Corp.,* 33 Wis.2d 445, 147 N.W.2d 529 (1967).

order extended to inks other than the three which had been the subjects of the suit, and they asked whether the order covered inks which had different ingredients than those in the commercial version of the 400 Series inks described in the court's June 18 memorandum. In response to the request for clarification, the district court said that the best clarification would be an explanation of its intentions. The court said the injunction was intended to cover *"any of those commercial jet ink formulas developed for specific customers* while Mansukhani was employed by plaintiff's predecessors." Order of July 13, 1982 (emphasis supplied). Defendants appealed the district court's permanent injunction, and this court affirmed. *American Can Co. v. Mansukhani*, 728 F.2d 818 (7th Cir.1982).

On July 20, 1983, plaintiff American Can filed ex parte papers contending that defendants were violating the terms of the permanent injunction by selling their inks SK–2914 and SK–2916. American Can asked for an ex parte temporary restraining order and for a finding that defendants were in contempt of court by selling inks violating the injunction. The court apparently was not satisfied with the plaintiff's initial showing. Five days later, on July 25, 1983, plaintiff presented to Judge Warren a second ex parte motion with a supplementary brief. In the motion, plaintiff sought an ex parte temporary restraining order which (1) would enjoin defendants from selling jet inks of any type to any of plaintiff's customers and (2) would permit plaintiff's employees (in the company of United States Marshals) to enter defendants' premises for the purpose of seizing ink samples and various documents.

On July 25, 1983, the district court held an ex parte hearing on plaintiff's motion for the temporary restraining order. The next morning, July 26, the district court signed the ex parte order which enjoined defendants from selling

> jet inks of any type, including defendants' SK–2914 and SK–2916 jet inks, to any of plaintiff's customers, previously serviced by Mansukhani when he was employed by plaintiff or its predecessors, including the customers Anheuser-Busch Company and Beverage Products, Inc.

Order of July 26, 1983. That portion of the order was in effect for ten days.[2] The court also ordered United States Marshals to accompany plaintiff's employees to the defendants' plant and to seize ink samples and documents which plaintiff's employees would identify. The temporary restraining order did not permit plaintiff to keep the seized samples and documents (as plaintiff had originally requested), but instead directed the marshals to keep the materials pending a further order from the court. In addition, the order set a hearing date of August 5 with respect to plaintiff's request for a preliminary injunction. After the court issued the ex parte order, plaintiff's employees and United States Marshals went to defendants' plant, served defendants with the temporary restraining order and took the samples pursuant to the order. Also that same day, plaintiff notified all of its commercial jet ink customers that the defendants were subject to the temporary restraining order.

Later that day, the defendants filed a motion asking the district court to lift or modify the temporary restraining order. The next day, on July 27, the district court held a hearing on the motion, but defendants were not permitted to present testimony contradicting the affidavits upon which the ex parte order had been based.[3] The district court denied defendants' motion to lift the restraining order, and on July 28 this court denied defendants' emergency application for a stay pending appeal. On

---

**2.** Mansukhani had had some dealings with virtually all of his customers while he was still employed by plaintiff, so the order effectively closed his business.

**3.** The district court's reasons for not permitting such testimony are not entirely clear from the transcript. However, the primary reasons ap-

pear to have been the absence of plaintiff's lead trial counsel (although plaintiff was represented at the hearing) and the fact that defendants had not given any advance notice of their intention to present such testimony to support their emergency motion. Plaintiff's Appendix at 115–20.

August 4, 1983, the day before the hearing on the preliminary injunction, Anheuser-Busch—a significant customer for both plaintiff and defendants—switched from defendants' ink to plaintiff's ink for use at its St. Louis canning facility.[4]

On August 5, 1983, the district court held a hearing on plaintiff's request for a preliminary injunction. At the end of the hearing, the court concluded that a preliminary injunction should issue and instructed counsel for both parties to work out the proper wording. After counsel were unable or unwilling to agree on wording, the district court issued on August 16, 1983, a memorandum order which supplemented the prior permanent injunction. The order permanently enjoined defendants

> from selling *those commercial jet inks developed while defendant Mansukhani was employed by plaintiff's predecessor* to the companies or individuals for whom those inks were specifically developed, or to any other companies or individuals. The set of inks so enjoined from sale by defendants includes but is not limited to those numbered R–453, P–473, and BK–493.

Order of August 16, 1983, at 6 (emphasis supplied). Defendants were also preliminarily enjoined from selling their inks numbered SK–2914 and SK–2916. This appeal followed. We have jurisdiction over this appeal under 28 U.S.C. § 1292(a)(1), for there can be little doubt that the preliminary injunction has had serious and perhaps irreparable consequences for defendants' business, and the injunction can be effectively challenged only by immediate appeal. Defendants thus easily meet the test of *Carson v. American Brands, Inc.*, 450 U.S. 79, 84, 101 S.Ct. 993, 996, 67 L.Ed.2d 59 (1981) (injunction might have irreparable consequences and only immediate appeal could be effective).

On appeal, defendants argue on various grounds that the temporary restraining order was improperly issued ex parte and that the preliminary injunction was invalid. For the following reasons, we conclude that the temporary restraining order should not have been issued ex parte, and that the preliminary injunction was erroneously granted because the plaintiff did not show sufficient likelihood of success on the merits and because the terms of the preliminary injunction are too vague. Defendants have raised numerous other arguments, but we find these to be without merit.[5]

## II

### THE TEMPORARY RESTRAINING ORDER

Appellants challenge the validity of the district court's temporary restraining order on a number of grounds, but all of their arguments revolve around the fact that the order was issued ex parte. Their conten-

---

**4.** Both sides agree that it is very expensive for a major customer to change from one ink supplier to another. The change may require a complete cleaning of the printing equipment, and in some cases, the customer may even have to shut down its production line for a time. These costs make customers reluctant to change suppliers. Therefore, if a customer were to change from one supplier to another who was misappropriating the former's trade secrets, the high costs of changing suppliers might well make the injury to the former's business irreparable. Similarly, if a supplier is wrongfully enjoined from supplying its customers, the loss of those customers may also be irreparable.

**5.** The argument pressed with most vigor is that Judge Warren punished defendants for contempt *without finding them in contempt*. Plaintiff has sought a finding of contempt, but to our knowledge, the district court has not yet acted on that request. In the proceedings which are the subject of this appeal, Judge Warren made it clear that he was not acting on the contempt motion and instead treated plaintiff's motions as ordinary requests for a temporary restraining order and preliminary injunction.

In addition, defendants have argued that Judge Warren is prejudiced against them, in part because of the ex parte hearing on July 25, 1983. We reject this claim of prejudice. It is not improper for a district judge to continue hearing a case after issuing an ex parte temporary restraining order. Further, the extensive record in this complex case shows that Judge Warren has been constantly aware of the merits of the defendants' position and of the need to protect the defendants' interests in competing fairly.

tions which merit attention on this appeal are that the temporary restraining order should not have been issued ex parte and that the order was defective on its face for failure to comply with Rule 65(b).

## A. MOOTNESS

We must first consider whether any issues regarding the validity of the temporary restraining order are moot because that order has been superseded by the preliminary injunction. American Can argues that because the temporary restraining order is no longer in force, the order can have no further effect on the rights and liabilities of the parties. *See Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 746 (7th Cir.1976); *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1030 (2d Cir.1974); *White Eagle v. One Feather*, 478 F.2d 1311, 1312 (8th Cir. 1973).

▆▆▆ However, it is well established that the presence of an injunction bond may prevent the validity of an expired order from becoming moot, and the cases upon which American Can relies do not involve injunction bonds. Where the party obtaining an injunction executes a bond to protect the enjoined party from damages resulting from a wrongful injunction, the validity of the injunction is not moot where there is a substantial possibility that the enjoined party will seek to recover under the bond. *E.g., Medtronic, Inc. v. Janss*, 729 F.2d 1395, 1398–99 (11th Cir.1984);

*Stacey G. v. Pasadena Independent School District*, 695 F.2d 949, 955 (5th Cir.1983).[6] The validity of an expired injunction can continue to affect the parties through an effort by the enjoined party to seek recovery on the bond for damages resulting from the injunction.[7] This view is also supported by *University of Texas v. Camenisch*, 451 U.S. 390, 393–94, 101 S.Ct. 1830, 1832–33, 68 L.Ed.2d 175 (1981), and *Liner v. Jafco, Inc.*, 375 U.S. 301, 305–06, 84 S.Ct. 391, 394–95, 11 L.Ed.2d 347 (1964).

If it were highly unlikely that defendants would seek to recover on American Can's injunction bonds, the existence of those bonds would not prevent the controversy from becoming moot.[8] In this case, however, we need not speculate on the mere possibility that the defendants might seek to recover on the bond. At oral argument, plaintiff informed us that defendants have moved under Fed.R.Civ.P. 65.1 to recover damages resulting from the district court's temporary restraining order and preliminary injunction. The district court's disposition of that motion would almost certainly address precisely the issues appellants ask us to consider on this appeal. The validity of the temporary restraining order thus remains in lively dispute between these parties.

▆▆▆ There is some question, however, whether we should, as a prudential matter, address the validity of the temporary re-

6. *See International Union v. La Salle Machine Tool, Inc.*, 696 F.2d 452, 458–59 (6th Cir.1982); *Northern Stevedoring & Handling Corp. v. International Longshoremen's & Warehousemen's Union*, 685 F.2d 344, 346–47 (9th Cir.1982); *Ashley, Drew & Northern Ry. Co. v. United Transp. Union*, 625 F.2d 1357, 1361–62 (8th Cir.1980); *American Bible Society v. Blount*, 446 F.2d 588, 594–96 (3d Cir.1971); *Meyers v. Jay Street Connecting Railroad*, 288 F.2d 356, 358–60 (2d Cir.), *cert. denied*, 368 U.S. 828, 82 S.Ct. 49, 7 L.Ed.2d 3 (1961).

7. The rule extends to bonds given for temporary restraining orders. *See, e.g., Medtronic, Inc. v. Janss, supra; Northern Stevedoring, supra; Ashley, Drew & Northern Railway, supra.*

8. *See International Union v. Dana Corp.*, 697 F.2d 718, 721–22 (6th Cir.1983) (en banc) (injunction bond did not preserve issue where de-

fendant had agreed not to seek recovery on bond); *Japan Air Lines Co. v. International Ass'n of Machinists & Aerospace Workers*, 538 F.2d 46, 50–51 (2d Cir.1976) (injunction was moot where there was only "mere possibility" of suit on bond and where counsel was unable to articulate compensable harm resulting from order); *Celotex Corp. v. Oil, Chemical & Atomic Workers Int'l Union*, 516 F.2d 242, 248–49 (3d Cir.1975) (union could not recover on injunction bond where union had agreed to continuance of order and could not show any expenses resulting from order). *See also Doe v. Marshall*, 622 F.2d 118, 119 (5th Cir.1980) (appeal from preliminary injunction moot where plaintiffs could not be held liable on injunction bond of $15.00), *cert. denied*, 451 U.S. 993, 101 S.Ct. 2336, 68 L.Ed.2d 855 (1981).

straining order on this appeal or should instead wait for further action by the district court and the parties. If the validity of the temporary restraining order turned on issues intertwined with the ultimate merits of the case, such as whether defendants' inks SK–2914 and SK–2916 misused plaintiff's trade secrets, then we would not attempt to decide such issues on this appeal.[9] However, the validity of the temporary restraining order here turns not on such final questions but instead on whether the ex parte temporary restraining order complied with due process and Rule 65. These issues are completely independent of the ultimate merits of the case, and the record is complete with respect to these issues. Also, the parties have fully briefed these questions on this appeal; we therefore see no reason to delay consideration of these issues until some later stage in the proceedings. For these reasons, the validity of the temporary restraining order is not moot, and we may address it on this appeal.

## B. THE EX PARTE PROCEEDINGS

■ This circuit has reviewed temporary restraining orders under the "abuse of discretion" standard applicable to preliminary injunctions. *Squillacote v. Local 248, Meat & Allied Workers,* 534 F.2d 735, 744–45 (7th Cir.1976). *See also Majd-Pour v. Georgiana Community Hospital, Inc.,* 724 F.2d 901, 902 (11th Cir.1984) (denial of restraining order not an abuse of discretion); *Community Communications Co. v. City of Boulder,* 630 F.2d 704, 708–09 (10th Cir.1980) (entry of restraining order an abuse of discretion where based on error of law), *rev'd on other grounds,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). However, the district court may abuse its discretion if it issues a temporary restraining order based on an erroneous view of the law or without due regard for the procedural requirements for such orders. *See, e.g., Coca-Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 315–16 (2d Cir.1982) (preliminary injunction); *Community Communications, supra,* 630 F.2d at 708–09 (temporary restraining order). In the present case, we conclude that the district court abused its discretion by ordering ex parte relief when there was no valid reason for proceeding ex parte and by disregarding the strict procedural requirements of Fed.R.Civ.P. 65(b) for the issuance of such ex parte orders.

The temporary restraining order was not invalid simply because it was issued ex parte. The Supreme Court has recognized that in some limited situations, a court may properly issue ex parte orders of brief duration and limited scope to preserve the status quo pending a hearing. *See Granny Goose Foods, Inc. v. Teamsters,* 415 U.S. 423, 438–39, 94 S.Ct. 1113, 1123–24, 39 L.Ed.2d 435 (1974); *Carroll v. Princess Anne,* 393 U.S. 175, 180, 89 S.Ct. 347, 351, 21 L.Ed.2d 325 (1968). In addition, Rule 65(b) expressly contemplates the issuance of ex parte temporary restraining orders. Nevertheless, the circumstances in which an ex parte order should be granted are extremely limited. The "stringent restrictions" imposed

> on the availability of *ex parte* temporary restraining orders reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute. *Ex parte* temporary restrain-

9. In *University of Texas v. Camenisch, supra,* for example, the Fifth Circuit had held that possible liability on a preliminary injunction bond kept the case from being moot, and that court addressed the merits of the expired order. *See Camenisch v. University of Texas,* 616 F.2d 127, 130–31 (5th Cir.1980). The Supreme Court agreed that the case was not moot but disagreed with the Court of Appeals' decision to reach the issue on the appeal from the preliminary injunction. Because the validity of the expired order and liability on the bond were entwined with the ultimate merits of the case, the Supreme Court held that the district court should be given the first opportunity to address those issues in a full trial instead of through the expedited preliminary injunction proceedings. 451 U.S. at 394–98, 101 S.Ct. at 1833–35. Central to the Court's disposition of the case was the fact that the question which kept the case from being moot—which party should pay for the plaintiff's interpreter—turned on the ultimate merits of the plaintiff's case.

322

ing orders are no doubt necessary in certain circumstances, cf. *Carroll v. President and Comm'rs of Princess Anne*, 393 U.S. 175, 180 [89 S.Ct. 347, 351, 21 L.Ed.2d 325] (1968), but under federal law they should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer. *Granny Goose Foods, supra,* 415 U.S. at 438–39, 94 S.Ct. at 1124.

Ex parte temporary restraining orders are most familiar to courts where notice to the adversary party is impossible either because the identity of the adverse party is unknown or because a known party cannot be located in time for a hearing. This is not such a case. Here the identities of the defendants and their attorneys were known to plaintiff and to the district court well before the issuance of the temporary restraining order. Also, time was not a pressing factor, for the district court did not issue the order until six days after the plaintiff first made its ex parte application. During that period, neither the plaintiff nor the court made any effort to notify defendants of the proceedings.

Plaintiff agrees that notice could have been given to the defendants, but it argues that this case falls within a very narrow band of cases in which ex parte orders are proper because notice to the defendant would render fruitless the further prosecution of the action. *See In the Matter of Vuitton et Fils S.A.,* 606 F.2d 1, 5 (2d Cir.1979) ("*Vuitton*"). In *Vuitton* the Second Circuit issued a writ of mandamus ordering the district court to issue an ex parte temporary restraining order to assist the petitioner in its trademark infringement case. The district court had denied the application for such an ex parte order because the adverse parties were known to the petitioner. However, the Second Circuit found that the petitioner had demonstrated that, if notice were given to the

alleged infringer, it was highly probable that the infringer would dispose of the infringing goods in the few hours before the hearing. The petitioner had supported that contention by describing its experience in other similar cases in which the actions became futile after defendants disposed of their inventories before the courts could issue orders and hold hearings. The Second Circuit held that the petitioner's showing was sufficient to justify issuance of an order "narrow in scope and brief in its duration." 606 F.2d at 5.

American Can argues that it "entertained the same fears as Vuitton." Appellee's Brief at 40. American Can asserts that notice of its ex parte request "would have immediately caused appellants to alter the inks in their factory and secrete the pertinent documents. In addition, notice would have permitted defendants to dispose of inks which clearly fall within the purview of the Court's injunction. Notice, in effect, would have frustrated the very purpose of the action, namely, to ascertain the existence of infringing goods." *Id.* Because an ex parte order is proper only when there is no reasonable alternative, we must examine each of the operative terms of the restraining order to determine whether this asserted risk justified the ex parte actions.

■ The first operative portion of the ex parte order enjoined defendants for ten days "from the continued sale of jet inks of any type . . . to any of plaintiff's customers, previously serviced by Mansukhani when he was employed by plaintiff or its predecessors . . . ." [10] There is no plausible reason for issuing this portion of the order ex parte. Even if we were to conclude that American Can had shown sufficient reason under *Vuitton* to permit the ex parte order for the preservation of ink samples and documents, that reason has utterly no application to the portion of the order which, for practical purposes, closed defendants' business for ten days. As the Supreme

---

**10.** As noted above, the same day that the order was issued, plaintiff also notified all of its cus- tomers of the order.

Court explained in *Granny Goose Foods, supra,* ex parte temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm *just so long as is necessary to hold a hearing, and no longer.*" 415 U.S. at 439, 94 S.Ct. at 1124 (emphasis supplied). This order was not thus restricted, and it should not have been issued.[11]

The second operative portion of the ex parte order authorized plaintiff's employees, with the assistance of the United States Marshals, to enter defendants' premises, take samples of jet inks and obtain for copying "all documents relating to defendants' sales of jet inks including sales to plaintiff's customers, defendants' production documents used to prepare the inks and Mansukhani's correspondence with customers of plaintiff." This is the portion of the order to which *Vuitton* might be applicable. We agree with the Second Circuit that ex parte orders of very limited scope and brief duration may be justified in order to preserve evidence where the applicant shows that notice would result in destruction of evidence. The problem we face here is whether American Can made a sufficient showing of the need for proceeding ex parte.

Where there are no practical obstacles to giving notice to the adverse party, an ex parte order is justified only if there is no less drastic means for protecting the plaintiff's interests. In this case, it would have been possible for the court to issue an order ex parte telling defendants to be prepared to show cause in an immediate

hearing why an order permitting such sampling and disclosure of documents should not have been entered. Such an order could have instructed defendants not to disturb their inventory, or to secrete documents pending the hearing, and an order of that scope would not have raised the concerns we have here about the ex parte proceedings. To show that a less drastic order would not have been sufficient to protect its interests, plaintiff must show, in effect, that the defendants would have disregarded a clear and direct order from the court to preserve the inks and documents for a few hours until a hearing could have been held.

In the papers filed in support of the motion for a temporary restraining order, American Can supported its assertion that the defendants would hide or destroy documents and falsify ink samples by saying that the defendants had failed to produce prior to or at trial any formula, ink sample or document in response to plaintiff's discovery requests and subpoenas. Plaintiff also pointed out that Mansukhani had had a number of plaintiff's confidential documents in his possession at the time of the court's permanent injunction. Mansukhani turned those documents over to plaintiff in compliance with the court's order.

We have examined the record to search for support for plaintiff's contentions, and we conclude that the record does not support any presumption that the defendants would have deliberately disregarded a direct court order to preserve inks and documents for a few hours.[12] The record leading up to the court's permanent injunction

---

**11.** There is no reason or authority for extending *Vuitton* beyond ex parte orders to preserve evidence or the court's jurisdiction. In *Vuitton,* the court made clear that although an ex parte order would be proper, the district court was to frame an order of brief duration and in narrow terms so that the defendants' interests would be protected until a hearing could be held. As we read *Vuitton,* the Second Circuit was authorizing the district court to issue an ex parte order limited to a few hours duration and limited to the purpose of preserving the infringing goods until a hearing could be held. 606 F.2d at 3, 5. In the present case, even if plaintiff had adequately shown the need for proceeding ex parte

to preserve the inks and documents, it failed utterly to show any need for an ex parte order preventing the defendants from competing with plaintiff.

**12.** The district court made no findings, either oral or written, on the issue of the need for proceeding ex parte to seize the ink samples and documents. On this record, any finding of such a need would have been clearly erroneous. However, as discussed *infra* in Part II–C, the absence of the relevant findings is also a serious defect in the temporary restraining order.

reveals numerous discovery disputes involving discovery requests by both side, but there is nothing unusual about such disputes in a trade secret case where both sides seek highly confidential information. *See, e.g., Natta v. Zletz,* 405 F.2d 99, 101–02 (7th Cir.1968). Both sides here have sought technical data, financial information and customer lists from one another, and both sides have resisted those requests. The district court has had to resolve several of the disputes, but nothing suggests that defendants did not comply with the court's orders. It is one thing to resist in good faith an opposing party's discovery request, as the record shows here, and it is quite another to disobey the court's order resolving such a dispute. There is simply no basis for inferring that a party who resists in good faith the opponent's discovery requests will also deliberately disobey the court's discovery orders.[13]

American Can also claims that defendants were shown to have been willing to disregard court orders because the inks they were selling were in violation of the terms of the court's permanent injunction. However, an ex parte allegation of contempt, upon which the ex parte order was based, is far different from a court's conclusion that its order has been violated. In addition, as we shall discuss in Part III, the scope of the permanent injunction was not entirely clear, and we do not think the plaintiff or the court could infer from the defendants' actions a willingness to disobey clear, specific and direct court orders.

### C. FACIAL VALIDITY

 The temporary restraining order was also invalid because the order violated the specific terms of Rule 65(b). Among the rule's strict requirements for ex parte temporary restraining orders, each such order "shall define the injury and state why it is irreparable and why the order was granted without notice ...." The temporary restraining order of July 26, 1983, failed to satisfy these requirements. The order did not (1) define or even mention the injury to be prevented, (2) state why that undefined injury would have been irreparable or (3) state why the order was granted without notice.

The specific requirements of Rule 65(b) are not mere technical legal niceties. They are "strongly worded, mandatory provisions which should be respected. They are not meaningless words." *Shannon v. Retail Clerks, International Protective Association,* 128 F.2d 553, 555 (7th Cir.1942). A temporary injunction can be an extremely powerful weapon, and when such an order is issued ex parte, the dangers of abuse are great. *See Walker v. City of Birmingham,* 388 U.S. 307, 330, 87 S.Ct. 1824, 1837, 18 L.Ed.2d 1210 (1967) (Warren, C.J., dissenting) ("This injunction was such potent magic that it transformed the command of an unconstitutional statute into an impregnable barrier, challengeable only in what likely would have been protracted legal proceedings and entirely superior in the meantime even to the United States Constitution."). *See also Carroll v. Princess Anne, supra.* Because "our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute," *Granny Goose Foods, supra,* 415 U.S. at 439, 94 S.Ct. at 1124, the procedural hurdles of

---

**13.** It is useful to compare here the showing made by the applicant in *Vuitton, supra,* where the district court was instructed to issue ex parte discovery orders. The petitioner showed that it had been involved in numerous similar cases and had encountered "various closely-knit distribution networks" for counterfeit products. 606 F.2d at 2. Vuitton had learned that the members of these networks were quite willing to avoid court orders by transferring their inventories and denying any knowledge of the source of the goods. While Vuitton apparently did not show that the specific defendants it sought to enjoin in that case had disregarded court orders in the past, it did show that defendants were members of the "closely-knit distribution networks" whose other members had been willing to do so, and that experience provided a fair basis for inferring the need to proceed ex parte there. In the present case, American Can's showing of need amounted to little more than a claim that there had been discovery disputes in the prior proceedings and that defendants had chosen to put plaintiff to its proof rather than to disclose their own trade information.

Rule 65 are intended to force both the movant and the court to act with great care in seeking and issuing an ex parte restraining order. This court has said that Rule 65(d) with its companion requirements "is no mere extract from a manual of procedural practice. It is a page from the book of liberty." *H.K. Porter Co. v. National Friction Products Corp.*, 568 F.2d 24, 27 (7th Cir.1977). The same is true for the Rule 65(b) requirements for ex parte temporary restraining orders where the dangers of abuse are especially great.[14]

The requirements of Rule 65(b) need not be burdensome when there is truly a need to proceed ex parte. The requirements at issue here demand only that the judge issuing the order articulate, and thus carefully consider, both the need for the restraining order and the need for proceeding ex parte. However, because this temporary restraining order did not comply with these facial requirements, it was wrongfully issued.[15]

## III

## THE PRELIMINARY INJUNCTION

The other issues in this appeal concern the scope of the plaintiff's trade secrets and the extent of the injunctive relief to which the plaintiff is entitled. These problems affect the plaintiff's showing of its reasonable likelihood of success on the merits. The same problems also affect whether the preliminary injunction complied with the Rule 65(d) requirements that injunctions "shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained."

■ This court has identified four requirements for the issuance of a preliminary injunction. The plaintiff must show (1) the threat of irreparable harm for which there is no adequate remedy at law; (2) that the threatened injury to plaintiff outweighs the harm an injunction might inflict on the defendant; (3) that the plaintiff has a reasonable likelihood of success on the merits; and (4) that the issuance of a preliminary injunction would not disserve the public interest. *In re Uranium Antitrust Litigation*, 617 F.2d 1248, 1261 (7th Cir. 1980). In reviewing a district court's decision to grant a preliminary injunction, we will reverse only if the district court has abused its discretion. *Machlett Laborato-*

**14.** The difficulties caused by departures from the rule are evident in this case. At a brief ex parte hearing on July 26, 1983, immediately before issuing the ex parte order, the court orally identified the irreparable harm which the order was intended to prevent, *viz.*, plaintiff's loss of customers and further disclosure and use of plaintiff's trade secrets. Plaintiff's App. at 64–65. At the same hearing, there was no mention of the reasons for proceeding ex parte. The court's comments in the ex parte hearing were not adequate here to satisfy the requirements of Rule 65(b); stating both the irreparable harm and the reasons for proceeding ex parte *on the face of the order* gives the restrained party some explanation of the order. That explanation may be helpful to the restrained party in seeking to modify the order or to correct mistakes resulting from the ex parte proceedings, and failure to comply with Rule 65(b) may unfairly hamper the restrained party in those efforts. In this case, for example, the court held a hearing on August 2 on defendants' motion to dismiss based on, among other reasons, the district court's failure to comply with the requirements of Rule 65(b) and (d) and Rule 52(a) (findings of fact and conclusions of law).

The court told defendants' counsel not to pursue these matters because the ex parte hearing (which defendants' counsel obviously did not attend) included oral findings of fact and conclusions of law on the record to comply with the rules. However, the hearing had not yet been transcribed, so defendants' counsel had no available record of the findings and conclusions. If the findings had been on the face of the order, as required, defendants might have been in a better position to persuade the district court that the order should have been lifted or modified.

**15.** In *Henry Hope X–Ray Products, Inc. v. Marron Carrel, Inc.*, 674 F.2d 1336, 1343 (9th Cir. 1982), the court affirmed an injunction against misappropriation of trade secrets where the injunction incorporated by reference a "confidential appendix." Although the order did not strictly conform to the Rule 65(d) prohibition against references to other documents, the use of the sealed appendix was necessary to ensure that the plaintiff's trade secrets were not disclosed. No similar justification could support the departures from Rule 65(b) in this case.

ries, Inc. v. Techny Industries, Inc., 665 F.2d 795, 797 (7th Cir.1981).

However, a district court abuses its discretion in issuing a preliminary injunction when it applies an incorrect legal standard in determining the likelihood of success on the merits. *Charles v. Carey,* 627 F.2d 772, 776 (7th Cir.1980). *See Wilson v. Watt,* 703 F.2d 395, 398 (9th Cir. 1983); *LeBeau v. Spirito,* 703 F.2d 639, 642 (1st Cir.1983). Similarly, a failure to observe the substantive or formal requirements for the court's order may constitute an abuse of discretion. *Coca-Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 315 (2d Cir.1982). Where the district court's error is the very predicate of its order, the order must be reversed as an improvident exercise of the court's discretion. *Id.* at 316; *White House Vigil for the ERA Committee v. Watt,* 717 F.2d 568, 571 (D.C.Cir.1983).

In the present case, the district court abused its discretion by applying an incorrect legal standard to determine the plaintiff's likelihood of success on the merits. The district court concluded that plaintiff had met its burden by showing the functional or practical similarity between its protected inks and defendants' new inks. However the public information about plaintiff's ink formulas (particularly as revealed in patent documents) and Mansukhani's own knowledge and experience had placed very narrow limits on plaintiff's trade secrets in the original trial. The district court's functional or practical similarity standard did not give adequate consideration to those original, narrow limits on plaintiff's trade secrets. The district court therefore erred by issuing the new preliminary injunction without finding that defendants' new inks were in fact substantially derived from plaintiff's trade secrets and not from the public information and Mansukhani's own skill, knowledge and experience. In addition, and as a result of the incorrect legal standard, the preliminary injunction does not comply with Fed. R.Civ.P. 65(d) because the terms are too vague to give the defendants fair notice of the prohibited conduct.

Throughout the proceedings in the district court, one of the thorniest issues concerned the scope of the injunctive relief to be accorded to plaintiff. It was clear that defendants could be and should be enjoined from continued misappropriation of plaintiff's trade secrets. But at the same time, it was equally clear that Mansukhani could not be enjoined from using public information and his general know-how and experience to compete fairly in the commercial jet ink business. The district court's permanent injunction in 1982 enjoined the defendants "from selling the commercial jet inks developed while Mansukhani was employed by plaintiff's predecessor to the companies or individuals for whom those inks were specifically developed, or to any other companies or individuals." The 1983 preliminary injunction used virtually identical language. Should that language prohibit defendants from making any inks (such as SK–2914) compositionally similar to those developed by plaintiff, as the plaintiff argues? Or should the injunction prohibit only the copying of the precise ink formulas developed by plaintiff, as the defendants argue?

To approach the problem, we must trace in some detail the district court's treatment of the scope of plaintiff's trade secrets and the appropriate relief, beginning with the 1982 trial leading to the permanent injunction. At that trial, Mansukhani's principal defense was that plaintiff's formulas for its 400 Series inks were not trade secrets. He introduced patent documents which, he argued, disclosed the relevant information, thus eliminating the secrecy needed to sustain a trade secret claim. (Several of the patent applications were by Mansukhani himself for inks developed while he was employed by plaintiff's predecessors.) His defense apparently had a sound legal basis, for information disclosed in a patent application is not secret and is not subject to trade secret protections, at least when the defendant knows about the patent disclosures. *See Ferroline Corp. v. General Aniline & Film Corp.,* 207 F.2d 912, 921

(7th Cir.1953), *cert. denied,* 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1098 (1954). *Cf. Syntex Ophthalmics, Inc. v. Tsuetaki,* 701 F.2d 677, 683 (7th Cir.1983) (defendant wrongfully disclosed information by writing patent application).

However, Mansukhani's defense foundered on factual grounds. Defendants pointed to close similarities between a public, patented ink formula and the 400 Series formulas claimed to be secret. Those formulas were:

| Ingredient | Patent | 400 Series |
|---|---|---|
| A | 25.1% | 20.0% |
| B | 38.4 | 40.2 |
| C | 25.1 | 26.5 |
| D | 11.0 | 11.0 |
| E | 0.3 | 0.3 |
| Dyes | 0.2 | 2.0 |
| | 100.0% | 100.0% |

The patented formula and the 400 Series inks included identical ingredients (except for different dyes) in similar proportions.[16] The district court held, however, that the *differences in proportion* of four of the ingredients in the two inks were sufficient to sustain the trade secret claim:

> Although the Court does not consider these differences major, it does agree with the plaintiff that *the information necessary to make the commercial inks sold* [by Mansukhani to three of plaintiff's customers] *are* [sic] *not revealed in all details in the patent.*

216 U.S.P.Q. at 1100 (emphasis supplied). This court agreed that the differences were sufficient to sustain the conclusion that the 400 Series formulas were trade secrets. 728 F.2d at 819.

The question on this appeal is the *scope* of plaintiff's trade secrets, or, more precisely, whether defendants may be enjoined from selling inks that are only *compositionally similar* to plaintiff's formulas. The patent disclosed each of the ingredients (except dyes) in the trade secret formulas, and proportions for these ingredients which were not dissimilar to those in the formulas. The protected trade secrets, then, must lie in the *precise proportions* of the ingredients in the 400 Series formulas. In light of the patent, plaintiff's formulas are protected only within a very narrow range of proportions. Anything beyond that narrow range is simply not a secret.

We must view the preliminary injunction proceedings in light of these limitations on the original findings with respect to plaintiff's trade secrets. Plaintiff argues that two of Mansukhani's new inks are "virtually identical" to the 400 Series inks which were protected as trade secrets by the court's order. The formulas for one of plaintiff's 400 Series inks (protected by the permanent injunction) and for Mansukhani's new SK–2914 ink were shown at the preliminary injunction hearing to be as follows:

| Ingredient | Plaintiff's 400 Series | Defendants' SK–2914 |
|---|---|---|
| A | 20.0% | 18.5% |
| B | 40.2 | 41.2 |
| C | 26.5 | 27.5 |
| D | 11.0 | ---- |
| X | ---- | 10.0 |
| E | 0.3 | ---- |
| Y | ---- | 0.3 |
| Z | ---- | 0.5 |
| Dye 1 | 2.0 | 1.4 |
| Dye 2 | ---- | 0.5 |
| Dye 3 | ---- | 0.1 |
| | 100.0% | 100.0% |

One need not be a chemist to see that the two formulas are quite similar in composition.[17] But, by the same token, the patented formula from the original trial was also very similar to the same 400 Series ink.

American Can's evidence at the preliminary injunction hearing was directed to-

---

**16.** Much of the evidence in the record is under seal in order to protect confidential information of both parties. This court, at plaintiff's request, has ordered the briefs in the case placed under seal by order dated August 10, 1984.

**17.** At oral argument, counsel for plaintiff suggested that Mansukhani's SK–2914 might actually be closer to the 400 Series formula than the evidence showed at the preliminary injunction hearing. If that is the case, it is a matter for the district court in the first instance. We consider here only the showing made in the preliminary injunction hearing.

ward showing that the differences between the ink formulas would not have significant effects on the performance of the inks. Plaintiff's chemist was asked about each change in the formulas, and he answered that each change would not have significant practical effects or make any "commercial difference." [18]

Defendants took a different approach by presenting evidence that the substitutions of new ingredients were well known in the field of jet ink chemistry, and that the changes in amounts of identical ingredients reflected considered judgments that would slightly, but significantly, improve the operation of the inks. They also pointed out that plaintiff's inks and defendants' inks were designed for use in the same printing equipment, and that the equipment imposed tight constraints on the physical characteristics of any inks used in it.

The district court focused on the "practical" similarities between the inks. Although the district court's written memorandum of August 16 did not discuss the patent, the judge did discuss the comparison with the patent in his oral decision at the end of the hearing on August 5. The judge said:

> I don't think the comparison of the commercial patent is particularly important. I don't think the issue is how far or how close SK2914 is to the commercial product but how close or far to 473 [the 400 Series ink] and I have indicated, I think that it's very close, I don't mean to say by all of this necessarily that this was all intentional, I don't know, that will have to await another day, but I do say that I think that because I have come down in the way I have on the likelihood of success on the merits that means I should issue and I will issue a preliminary injunction.

Defendants' Appendix at 91. The court also addressed the fact that plaintiff's and defendants' inks did not use the same ingredients. With respect to the different solvents, the court focused on the similar "functional serviceability." The court said, "If it's known in the trade that one does the same thing as the other, I don't think that substantively distinguishes the ink." With respect to defendants' use of a small amount of water in their inks, the district court apparently accepted Ruth Brand's explanation of its purpose but did not find that purpose significant. In addition, the court said it was impressed by the fact that the dyes used in defendants' ink were also listed in the same proportions in a notebook that Mansukhani used while employed by plaintiff's predecessors. The court therefore concluded that Mansukhani had learned about the combination of dyes while trying to develop specific inks for plaintiff's customers. On these grounds, and on the complete record of the hearing, the court determined that plaintiff had shown a sufficient likelihood of success on the merits, and the injunction was issued. The court concluded that defendants' inks SK–2914 and SK–2916 were "for practical purposes among those commercially developed for specific customers while Mansukhani was employed by plaintiff's predecessor ...." Order of August 16, 1983, at 4.

The question on appeal is whether plaintiff showed it was likely to succeed on the merits. And for plaintiff to succeed on the merits, it had to show that defendants' new inks were a misappropriation of its trade secrets. Defendants argue that their new inks, while admittedly similar to plaintiff's inks, were developed from public information and are sufficiently distinct so as not to embody plaintiff's trade secrets.

■ At issue here are two well-established and, at times, competing principles of trade secret law. The first is that a party may not use another's trade secret,

---

**18.** The last question and answer from the chemist's direct examination were:

> Q: What is the conclusion that you have reached with those inks, with respect to those inks?

> A: I believe that these inks are virtually identical to each other, operate the machines in the same manner, chemical compositions are very similar and they will print codes that are essentially the same, except for the slight difference in color.

even with independent improvements or modifications, so long as the product or process is substantially derived from the trade secret. *M. Bryce & Associates, Inc. v. Gladstone,* 107 Wis.2d 241, 252, 319 N.W.2d 907, 912 (Wis.App.1982), *cert. denied,* 459 U.S. 944, 103 S.Ct. 258, 74 L.Ed.2d 201 (1982). *See Motorola, Inc. v. Computer Displays International, Inc.,* 739 F.2d 1149 at 1156 (7th Cir.1984) (applying Illinois law in accord with Restatement of Torts § 757); *Forest Laboratories, Inc. v. Pillsbury Co.,* 452 F.2d 621, 625 (7th Cir.1971) (applying Wisconsin law); Restatement of Torts § 757 comment c (1939). If the law were not flexible enough to reach such modifications, trade secret protection would be quite hollow. As the Supreme Court remarked in dealing with the analogous problem of patent equivalents, "Outright and forthright duplication is a dull and very rare type of infringement." *Graver Tank & Manufacturing Co. v. Linde Air Products Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

 The second principle is a corollary to the first: trade secret protection should not extend beyond the limits needed to protect genuine trade secrets. *See Winston Research Corp. v. Minnesota Mining & Manufacturing Co.,* 350 F.2d 134, 143–44 (9th Cir.1965). The primary purpose of trade secret law is to encourage innovation and development, and the law should not be used to suppress legitimate competition. *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 481–82, 94 S.Ct. 1879, 1886–87 40 L.Ed.2d 315 (1974). Broader protection would stifle legitimate competition by prohibiting competitors from using their own independent discoveries, public information and reverse engineering. Wisconsin courts have consistently required that trade secret protection be limited to genuinely confidential information. *See, e.g., Gary Van Zeeland Talent, Inc. v. Sandas,* 84 Wis.2d 202, 267 N.W.2d 242, 250 (1978) ("Where a restraint of trade is tolerated, it is permitted only to the extent absolutely necessary to afford reasonable protection."); *Abbott Laboratories v. Norse Chemical Corp.,* 33 Wis.2d 445, 147 N.W.2d 529, 535, 538 (1967) (substantial element of secrecy required but not shown regarding plaintiff's chemical production process); Restatement of Torts § 757 comment b (1939).

 The owner of a trade secret is not entitled to prevent others from using public information to replicate his product, nor may the owner prevent others from making similar products which are not derived from the trade secret. *Kewanee Oil, supra,* 416 U.S. at 476, 94 S.Ct. at 1883; *E.W. Bliss Co. v. Struthers-Dunn, Inc.,* 408 F.2d 1108, 1114–15 (8th Cir.1969); *Abbott Laboratories, supra,* 147 N.W.2d at 538–39. Particularly in the case of a former employee, whose livelihood may well depend on the scope of the former employer's trade secret protection, it is important to permit the employee to use his or her skill, training and experience. *E.W. Bliss Co., supra; Winston Research Corp., supra,* 350 F.2d at 142–44; *Abbott Laboratories, supra,* 147 N.W.2d at 538 (employee's knowledge of chemical production process was "know-how or skill which cannot be blotted out of an employee's mind and cannot be labeled a trade secret").[19]

It is the tension and balance between these two general principles that is at the core of this case. American Can has shown that several of its ink formulas are trade secrets and that Mansukhani has misappropriated them in the past. *American Can Co. v. Mansukhani, supra,* 728 F.2d at 819–20. American Can is therefore entitled to effective protection against such misappropriation. At the same time, the *scope* of American Can's trade secrets was extremely narrow—the protected secrets are limited to the *precise proportions* of ingredients which are themselves already

19. *See also Corroon & Black-Rutters & Roberts, Inc. v. Hosch,* 109 Wis.2d 290, 325 N.W.2d 883, 886–87 (1982) (insurance agency's customer and expiration lists not sufficiently confidential); *id.,* 325 N.W.2d at 893 (Abrahamson, J., dissent-ing) (need for balance among policies of fostering competition, protecting employers' investments in valuable information and permitting employees "to draw upon their general knowledge, experience and skill, however acquired").

in the public domain. It is also clear that Mansukhani has substantial skill, knowledge and experience in formulating commercial jet inks, and he is entitled to use those skills to compete against American Can.

In seeking the right—and delicate—balance between these competing considerations, the district court focused on the practical similarities between Mansukhani's new inks and American Can's formulas protected under the permanent injunction. In most instances, the close similarities between the products would no doubt support findings that trade secrets had been misappropriated. In this case, however, it is essential to keep in view the original limitations *which permitted plaintiff to show that its formulas deserved any protection at all.*

A most instructive analogy is discussed in this court's decision in *Union Carbide & Carbon Corp. v. Graver Tank & Manufacturing Co.,* 196 F.2d 103 (7th Cir.), *cert. denied,* 343 U.S. 967, 72 S.Ct. 1059, 96 L.Ed. 1363 (1952). The case arose from the same litigation which produced a leading Supreme Court opinion on patent equivalents, *Graver Tank, supra,* 339 U.S. at 608–09, 70 S.Ct. at 856–57. The plaintiff in the case brought a contempt motion for violation of the permanent injunction against infringement, and the district court granted the motion. The district court held that under the doctrine of equivalents the defendant had continued its infringement by using a product which did substantially the same thing and operated in substantially the same way as the patented product. 196 F.2d at 108. This court reversed on grounds very similar to those in the present case.[20] In the original patent litigation, the plaintiff had been able to sustain the validity of its patent only after narrowing the original claims both to prevent them from being too vague and to distinguish the claims from the prior art. Under the rubric of "estoppel," this court

held that the defendant's modified product did not infringe the plaintiff's patent and did not violate the prior injunction:

> While the difference between plaintiff's composition and those accused may not be great, it is that difference which distinguished plaintiff's composition from the prior art and which enabled it to sustain the validity of its grant. It is now estopped from claiming otherwise.

196 F.2d at 112. *See also Reinforced Earth Co. v. Neumann,* 201 U.S.P.Q. (BNA) 205, 215 (D.Md.1978) (enjoining defendant from using trade secrets, but permitting it to use general principle, known in the trade, in system similar to plaintiff's protected system). Regardless whether the label "estoppel" is applied, the same reasoning applies here. American Can was able to sustain its original trade secret claims only by narrowly confining the scope of those claims to distinguish them from information in the public domain. The courts cannot now disregard those necessary limits when considering the scope of relief to which American Can is entitled. Otherwise, plaintiff's trade secret protection would be extended to protect plaintiff from legitimate competition.

We recognize that courts have on occasion extended trade secret protection beyond the scope of the plaintiff's trade secrets where effective relief would otherwise have been impossible. However, those cases generally involve much broader trade secrets or products which simply could not be made without some use of the trade secrets. *See, e.g., Head Ski Co. v. Kam Ski Co.,* 158 F.Supp. 919, 924 (D.Md. 1958) (enjoining manufacture of bonded skis); *ILG Industries, Inc. v. Scott,* 49 Ill.2d 88, 273 N.E.2d 393, 397 (1971) (enjoining manufacture of entire product where essential components involved trade secrets). In the case before us, by contrast, the original scope of the valid trade secrets was so narrow that expanded protection would tend to restrict competition.

---

**20.** This court recently discussed the usefulness of the patent doctrine of equivalents in trade secret cases in *Motorola, Inc. v. Computer Dis-*

*plays International, Inc.,* 739 F.2d 1149 at 1156–1157 (1984).

Were this a case involving straightforward conflicts in the evidence, we would of course defer to the district court's resolution of such conflicts. But this case involves a more delicate problem involving conflicting legal standards. Plaintiff's theory, adopted by the district court, is that the trade secret protection covers any inks which are similar to plaintiff's protected inks, and that similarity should be gauged in terms of practical operation in printing machines. Defendants' theory is that because plaintiff's original trade secret protection was so narrow, in view of available public information about *very* similar inks, similar inks do not result in misappropriation of plaintiff's trade secrets unless it is clear that defendants' new inks were derived from plaintiff's trade secrets *and not* from the very similar public information.

■ We do not decide that the district court could never have enjoined defendants from producing and selling the inks challenged here. The issue of derivation is one of fact and is subject to the clearly erroneous standard of review. *Motorola, Inc. v. Computer Displays International, Inc.,* 739 F.2d 1149 at 1157 (7th Cir.1984). However, in our view the district court here applied an incorrect legal standard in issuing this preliminary injunction. Although the standard was not articulated precisely, the district court applied a standard of functional or practical similarity to determine whether defendants should be enjoined from selling their new inks. Similar-

ity may be probative of derivation, but it is much less probative where the scope of the trade secrets is as narrow as it is in this case. The "similarity" standard lost sight of the original limitations on the plaintiff's trade secrets. Plaintiff was entitled to protection only if defendants' new inks were substantially derived from plaintiff's trade secrets and not from public information and Mansukhani's general skill, experience and knowledge. More than a finding of similarity was required where the public information and defendant's own knowledge confined so narrowly the scope of the valid trade secrets.[21]

Many of these same considerations also lead us to conclude that the preliminary injunction is too vague in scope to pass muster under Rule 65(d). In its original permanent injunction, the district court enjoined the defendants from "selling the commercial jet inks developed while Mansukhani was employed by plaintiff's predecessor to the companies or individuals for whom those inks were specifically developed, or to any other companies or individuals." On defendants' motion for clarification, the court explained that the order was not limited to those inks which had been the focus of the trial. "Rather, it was the Court's intention to enjoin defendants from misappropriating any of those commercial jet ink formulas developed for specific customers while Mansukhani was employed by plaintiff's predecessors." For present purposes, the key factor is that the permanent

---

21. The district court's discussion of the evidence at the preliminary injunction hearing prevents us from construing the court's finding of similarity as containing an implicit finding that the new inks were substantially derived from plaintiff's trade secrets. Plaintiff's chemist was careful to testify in terms of "commercial differences" and "practical effects" on the functioning of the different inks in the printing equipment, and the district court also spoke in "practical" terms. The district court was impressed by the similarities between defendants' formulas and formulas found in Mansukhani's research notebooks from his prior employment. However, it may not be assumed that all information in the notebooks was protected; after all, Mansukhani is fully entitled to use public information and his own general knowledge, even if he acquired that knowledge while in plaintiff's employ. The

district court also emphasized that defendants appeared to have replaced ingredients in plaintiff's formulas with different ingredients known in the trade to be useful (though not identical) substitutes. The district court concluded that the differences resulting from these known substitutions were not sufficient, as a practical matter, to distinguish the inks. But in our view, the general trade knowledge of the substitutes only strengthens defendants' contention that the new inks were derived primarily from public information, general trade knowledge and Mansukhani's own legitimate experience and skill. In light of plaintiff's evidence and the court's treatment of it, therefore, we cannot construe the district court's findings as consistent with the proper standard, *i.e.,* whether defendants' new inks were substantially derived from plaintiff's trade secrets.

injunction as clarified was issued in the context of a trial involving absolutely identical inks with the same components in the same proportions to within one-tenth of one percent.

The ex parte order which was in effect for ten days was broader in scope. It prohibited defendants from selling commercial jet inks of any type to any of plaintiff's customers whom Mansukhani had previously serviced while employed by plaintiff's predecessors. The preliminary injunction issued on August 5, 1983, returned to the language of the permanent injunction; defendants were still enjoined from selling "those commercial jet inks developed while Mansukhani was employed by plaintiff's predecessor ...." The prohibition also specifically included inks SK–2914 and SK–2916. However, although the operative language remained the same, the context had changed significantly. The preliminary injunction was issued after a showing that defendants' inks were only *similar* to plaintiff's inks, not that they were identical. The difference is substantial, for it expanded the scope of the prohibition, particularly in light of the district court's standard of functional or practical similarity. An ink may fall within the preliminary injunction if it is merely similar to one of plaintiff's formulas, including even those which have not yet been proven to be trade secrets.

The district court recognized the problem and noted that it did not intend "to wholly restrict defendants from competing in the commercial ink business." The court suggested that when defendants produce inks "compositionally similar" to plaintiff's protected inks, there would be some difficulty in determining whether the inks are "sufficiently distinct." The court recommended to the parties that they consider such problems in light of the entire court record and "consider especially whether the development of a new ink can be attributed principally to the use or disclosure of a trade secret owned or developed by plaintiff or any of its predecessors while Mansukhani was an employee." The court urged both parties to settle such matters of interpretation through negotiation without the court's intervention.

■ Although any injunction may present problems of interpretation, the injunction must be clear enough and specific enough to fairly apprise the enjoined party of the prohibited conduct. "Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard,* 414 U.S. 473, 476, 94 S.Ct. 713, 715, 38 L.Ed.2d 661 (174). The problem of framing an appropriate order may be particularly acute in trade secret cases, *see Syntex Ophthalmics, Inc. v. Tsuetaki,* 701 F.2d 677, 684 (7th Cir. 1983), but trade secret injunctions that are too vague must be set aside. In *E.W. Bliss Co. v. Struthers-Dunn, Inc.,* 408 F.2d 1108, 1113–17 (8th Cir.1969), for example, the district court had issued an order enjoining defendants from, among other things, "using or disclosing trade secrets and confidential technical information of plaintiff." The court of appeals reversed because the order was too vague to give the defendant fair notice of the prohibited conduct. Similarly, in *Brumby Metals, Inc. v. Bargen,* 275 F.2d 46, 49 (7th Cir. 1960), this court reversed an injunction which prohibited the defendant from selling furniture incorporating plaintiff's design feature "either as offered by plaintiff, or as offered in the current sales literature of Schoolco, Inc., or any variation thereof." We held that the language of the injunction was too vague. *See also Diapulse Corp. v. Carba, Ltd.,* 626 F.2d 1108 (2d Cir.1980) (injunction against "similar devices"; court found vagueness "most troubling", but defendant had not appealed the question). *Cf. Panther Pumps & Equipment Co. v. Hydrocraft, Inc.,* 566 F.2d 8, 21 (7th Cir. 1977) (affirming civil contempt judgment for patent infringement where there was "no fair ground to doubt" that conduct violated injunction), *cert. denied,* 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978).

■ While we are sympathetic to the difficulty of framing orders that provide plaintiffs with appropriate protection while still putting defendants fairly on notice of the prohibited conduct, the district court's orders in this case do not suffice. The court's orders add up to a permanent injunction against selling inks which are "compositionally similar" to plaintiff's inks and which can be "attributed principally" to the use of plaintiff's trade secrets. That may implicitly be the correct legal standard (based on "derivation") for determining whether defendants' inks actually result in misappropriation of plaintiff's trade secrets, but that standard is too vague for an injunction.[22]

This situation is similar to that in *E.W. Bliss Co. v. Struthers-Dunn, Inc., supra.* There the district court had enjoined the defendants from using the plaintiff's "trade secrets and confidential technical information." The Eighth Circuit rejected such a broad approach, which would have required the defendants "to test their legal opinion on the law of trade secrets and their technical opinion on the state of the prior art in a proceeding to show cause why they should not be held in contempt." 408 F.2d at 1114. That approach placed an unduly harsh burden on the defendants. In the case before us, the orders on their faces are not obviously too vague, but when they are interpreted (as they must be) in light of the entire court record, the uncertainty becomes too great. When the original permanent injunction was issued, it clearly prohibited exact copies of plaintiff's inks. That order was issued in the context of the very narrow scope of plaintiff's protected trade secrets. The same language, however, has now been expanded to reach inks with different ingredients and with different proportions. Particularly in view of the amount of information in the public domain and Mansukhani's own legitimate experience, the expansion is impermissible here.

It is true that a defendant must exercise care to avoid violating an injunction, *Panther Pumps & Equipment Co. v. Hydrocraft, Inc., supra,* 566 F.2d at 21, but the courts may not require defendants to exercise that caution without substantial guidance. As our discussion above should indicate, determining whether defendants' products are derived from plaintiff's trade secrets rather than from public information can be a very difficult task, particularly in this case. The defendants cannot be expected to decide, even with caution, under the threat of contempt whether their conduct is lawful without more guidance from the court. The district court has not defined the scope of the trade secrets, and the defendants can not be required to test their legal opinions on such difficult trade secret issues through contempt proceedings. *E.W. Bliss Co., supra,* 408 F.2d at 1114.[23]

## IV

### SUMMARY

We conclude that the temporary restraining order was issued improperly because there was no need to proceed ex parte and because the order did not conform with

---

22. In *Motorola, Inc. v. Computer Displays International, Inc.,* 739 F.2d 1149 (7th Cir.1984), this court affirmed a finding of contempt where the defendant had violated the terms of a consent decree prohibiting the use of any of plaintiff's confidential or proprietary information. At 1159. As the court's opinion makes clear, parties to a consent decree may voluntarily agree to give the plaintiff *more* protection than a court could after a full trial. At 1159. Thus, a party may voluntarily subject itself to such broad prohibitions. However, where defendants have never consented to these broad prohibitions, as here, the concerns for fairness run beyond the scope of enforcing a voluntary agreement.

23. The district court faced a similar problem in *Syntex Ophthalmics, Inc. v. Tsuetaki, supra,* and devised a procedure by which defendants could seek prior approval from the district court, with the aid of a special master, for distinguishing between plaintiff's trade secrets and public information. 701 F.2d at 679–80. A similar method might be appropriate here so that defendants may conform their conduct to the injunction without risking contempt and without exposing their own trade secrets to plaintiff each time they invent a new ink formula.

Rule 65(b). In addition, we vacate the preliminary injunction because plaintiff failed to establish its likelihood of success on the merits and because the terms of the injunction are too vague to conform with Rule 65(d). The matter is remanded to the district court for further proceedings; any injunctive relief should be consistent with this opinion. The permanent injunction, which was affirmed by this court two years ago, remains in place, but the future application and interpretation of the injunction must be consistent with this opinion. Defendants may only be enjoined from infringing plaintiff's genuine trade secrets, bearing in mind the limits which permitted plaintiff to establish that it was entitled to any protection at all.[24]

REVERSED AND REMANDED.

**24.** Plaintiff is not entitled to protection from defendants' inks that are reverse engineered or independently derived from public information or Mansukhani's own skill, knowledge and experience. Reverse engineering (or chemical analysis) appears to be a relatively simple task in this field, and the extent of public information appears to make trade secrets in this field very fragile and short-lived creations. Although the possibility of reverse engineering or independent development does not excuse one who obtains trade secrets wrongfully, it places limits on the plaintiff's protectible interest and on the appropriate scope of relief. *K–2 Ski Co. v. Head Ski Co.,* 506 F.2d 471, 474–75 (9th Cir.1974). *See Forest Laboratories, Inc. v. Formulations, Inc.,* 299 F.Supp. 202, 207 (E.D.Wis.1969) (Wisconsin courts would not find liability after life of trade secret had expired), *aff'd in relevant part, Forest Laboratories, Inc. v. Pillsbury Co.,* 452 F.2d 621, 624 n. 4 (7th Cir.1971). *See generally Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 476, 490, 94 S.Ct. 1879, 1883, 1890, 40 L.Ed.2d 315 (1974) (discussing reverse engineering).

There has been a long-standing dispute among the federal circuits about whether a party misappropriating trade secrets should be enjoined *permanently* from using the information or whether the duration of the injunction should be limited to put the defendant in the position it would have been in absent the misappropriation. Compare *Shellmar Products Co. v. Allen-Qualley Co.,* 87 F.2d 104, 109–10 (7th Cir.1936) (permanent injunction), with *Conmar Products Corp. v. Universal Slide Fastener Corp.,* 172 F.2d 150, 155–56 (2d Cir.1949) (no injunction after disclosure), and *Winston Research Corp. v. Minnesota Mining & Manufacturing Co.,* 350 F.2d 134, 141–42 (9th Cir.1965) (injunction for period needed for legitimate development after disclosure). *See generally* Note, *Trade Secrets: How Long Should an Injunction Last,* 26 UCLA L.Rev. 203 (1978). Although discussion of this issue often focuses on the disagreements between the circuits, Judge Gordon properly recognized in *Forest Laboratories, supra,* that trade secret law is state law, and the federal appellate decisions are not necessarily the final word on these issues of state law. 299 F.Supp. at 207. *See also Brunswick Corp. v. Outboard Marine Corp.,* 79 Ill.2d 475, 38 Ill.Dec. 781, 404 N.E.2d 205, 207 (1980) ("headstart" injunction should be granted instead of "permanent" injunction, thereby fostering competition and permitting former employees to use their abilities). *Cf. Motorola, Inc. v. Computer Displays International, Inc., supra,* at 1159 (enforcing permanent terms of *consent decree*).