In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-3021 & 00-2972

Minnesota Mining & Manufacturing Company,

Plaintiff-Appellee, Cross-Appellant,

v.

Ronald Pribyl, James Harvey, Thomas Skrtic,
and Accu-Tech Plastics, Incorporated,

Defendants-Appellants, Cross-Appellees.

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 99 C-0265-S--John C. Shabaz, Judge.

Argued May 11, 2001--Decided July 25, 2001


   Before Flaum, Chief Judge, and Bauer and
Evans, Circuit Judges.

   Flaum, Chief Judge. The Minnesota Mining
and Manufacturing Company ("3M") produces
and markets a product known as carrier
tape. When the company discovered that
three of its employees had formed Accu-
Tech Plastics ("Accu-Tech") to
manufacture and market resin sheeting,
the essential component of carrier tape,
3M brought suit. After dismissing certain
3M claims pursuant to Accu-Tech's summary
judgment motion, the case proceeded to
trial. The jury ultimately determined
that Accu-Tech had misappropriated trade
secrets from 3M and that Accu-Tech's
founders had breached duties of loyalty
owed to 3M. Following trial, the district
court overturned some of the jury's find
ings of liability, upheld other findings,
and granted 3M's request for a permanent
injunction barring the disclosure (but
not the use) of the trade secrets which
the jury found Accu-Tech had
misappropriated. When final judgment was
entered below, the parties filed cross-
appeals challenging decisions made by the
district court throughout the litigation.
For the reasons stated herein, we affirm
the district court's decisions as they
pertain to Accu-Tech's issues on appeal.
As for 3M's claims of error, we affirm in
part, and reverse and remand in part the
decisions of the district court.

## I.  BACKGROUND

Since 1986, 3M has manufactured and sold carrier tape through its Surface Mount Supplies Division. Carrier tape, which is used to transport sensitive electronic components, is made principally from a thin layer of plastic called resin sheeting into which pockets are molded to fit the components to be transferred. 3M also manufactures the resin sheeting necessary to produce carrier tape. However, 3M, preferring the higher profit margins that attend to the sale of carrier tape, does not vend resin sheeting in the open market (except to its foreign subsidiaries).

Three individuals who were integral to 3M's development and production of resin sheeting and carrier tape were Ronald Pribyl, Thomas Skrtic, and James Harvey. Pribyl, who began working for 3M in 1989 as its Manager of Manufacturing for North America, supervised the production of all of 3M's resin sheeting and carrier tape in North America. Skrtic, an employee of 3M's Surface Mount Supplies Division from 1986, was the primary developer of 3M's resin sheeting manufacturing process. Finally, Harvey, who worked as 3M's quality supervisor, was the principal author of a series of 3M manuals documenting the operating, training, and quality control procedures for producing resin sheeting and carrier tape.

In 1996, 3M announced that it was moving its carrier tape business from Menominee, Wisconsin to Hutchinson, Minnesota. For a variety of reasons, Pribyl, Skrtic, and Harvey did not wish to relocate to Minnesota. Thus, in 1997, the trio, while still under the employ of 3M, formed Accu-Tech. Accu-Tech manufactures and sells resin sheeting to various companies, including those who use the product to manufacture carrier tape. However, Accu-Tech itself does not produce any carrier tape. For approximately two years, Pribyl, Skrtic, and Harvey operated Accu-Tech while still working for 3M. It was not until March of 1999 that their clandestine operation was discovered by 3M. Upon learning of Accu-Tech's existence, 3M terminated all three individuals.

On April 23, 1999, 3M brought a

diversity suit against Pribyl, Skrtic, Harvey, and Accu-Tech, in the District Court for the Western District of Wisconsin. 3M asserted a litany of claims against Accu-Tech's founders, including breach of fiduciary duty, breach of employment contracts, and misappropriation of trade secrets. The complaint also alleged that Accu-Tech, as a corporate entity, had misappropriated trade secrets, engaged in unfair competition, tortiously interfered with prospective contractual relationships, and tortiously induced Skrtic to breach his employment contract with 3M.

Following discovery, the parties filed cross-motions for summary judgment. On November 12, 1999, the district court granted summary judgment in favor of Accu-Tech and its founders on the breach of contract and tortious interference with contract claims. Additionally, the court granted summary judgment to the defendants on the claim for breach of fiduciary duty to the extent that it was based on alleged improper competition with 3M by Accu-Tech's founders. Finally, the district court held that 3M's unfair competition claim was indistinguishable from its claims for trade secrets misappropriation and tortious interference with contract. Thereafter, on December 7, 1999, the court granted summary judgment in favor of Accu-Tech and its founders on 3M's claim for tortious interference with prospective contractual relations.

The case proceeded to a bifurcated trial, which commenced on December 13, 1999. On December 16, the jury returned a verdict on liability, finding that: (1) Accu-Tech's founders had each breached a duty of loyalty to 3M, (2) 3M owned four trade secrets, and (3) Accu-Tech and its founders had misappropriated or threatened to misappropriate two of those four trade secrets. The two trade secrets which the jury determined the defendants had misappropriated were (1) the operating procedures, quality manuals, training manuals, process standards, and operator notes for using plaintiff's equipment that makes resin sheeting ("op erating procedures and manuals"), and (2) customized resin formulations that enhance the sheeting and thermoforming capability of resin and give it properties needed in the electronic

industry./1 The following day, the jury returned its findings on damages. On 3M's claim for breach of the duty of loyalty, the jury determined that Pribyl was liable in the amount of $126,875, while Harvey and Skrtic each owed 3M $46,000. The jury additionally awarded damages against Accu-Tech and its founders in the amounts of $83,000 for misappropriation of 3M's trade secret in customized resin formulations and $187,500 for misappropriation of 3M's trade secret in the operating procedures and manuals.

Shortly thereafter, the defendants filed a motion for judgment as a matter of law or for a new trial. While that motion was pending, 3M moved for the entry of a permanent injunction. On February 9, 2000, the district court par tially granted 3M's motion, permanently enjoining the defendants from disclosing any of the four trade secrets found by the jury, and from using the two trade secrets which the jury had not found use or disclosure of. However, the court denied 3M's request for a permanent injunction against the use of 3M's customized resin formulations and operating procedures and manuals.

On March 2, 2000, the district court granted, in part, defendants' motion for judgment as a matter of law. The court partially overturned the jury's verdict, ruling that the defendants were not liable for misappropriating 3M's trade secret in its customized resin formulations. The court also ordered a new trial on the issue of damages for 3M's breach of loyalty claim, unless 3M accepted a remittitur. Rather than face a new trial on damages, 3M accepted the remittitur. On July 20, 2000, the district court entered its final judgment.

Discontented with various decisions below, the parties have now filed cross-appeals in this court. For their part, defendants argue three points of error. First, they assert that 3M failed to offer any evidence that any specific information within the scope of 3M's trade secret in the operating procedures and manuals was actually secret to 3M or used or disclosed by the defendants. Thus, defendants argue that the district court erred in not granting them judgment as a matter of law on 3M's

misappropriation claim regarding those items. Secondly, defendants argue that the district court's order permanently enjoining them from disclosing to any third party 3M's operating procedures and manuals is overly vague, and thus violates Fed. R. Civ. P. 65(d). Finally, they put forth that the district court erred in admitting excerpts from 3M's business conduct manual dealing with an employee's operation of a business that is in competition with any 3M business.

For its part, 3M suggests four points of error. First, 3M argues that the district court erred in granting Accu-Tech summary judgment on 3M's claim that Accu-Tech had tortiously interfered with defendant Skrtic's employment contract. Second, 3M contends that the court similarly erred in granting Accu-Tech summary judgment on 3M's unfair competition claim against the company. Third, 3M asserts that the district court erred in overturning the jury's finding that the defendants had misappropriated 3M's trade secret in its customized resin formulations. Finally, 3M claims that the district court erred in denying the company a permanent injunction against defendants' use of 3M's trade secrets that the jury found had been misappropriated.

II.  DISCUSSION

A.  Accu-Tech's Issues On Appeal

   1.  Misappropriation of 3M's Trade Secret

As noted above, the jury determined that 3M had a valid trade secret in its operating procedures and manuals, which in the course of forming and operating Accu-Tech, the defendants had misappropriated. Appellants' primary assertion on appeal is that the evidence produced at trial was insufficient to support either of those findings by the jury, and that thus the district court erred in not granting judgment as a matter of law.

Though we review the denial of a motion for judgment as a matter of law de novo, see Emmel v. Coca-Cola Bottling Co. of Chicago, 95 F.3d 627, 629 (7th Cir. 1996), our inquiry is limited to determining whether the evidence presented, combined with all reasonable

inferences permissibly drawn therefrom, is sufficient to support the jury's verdict when viewed in the light most favorable to the nonmoving party, see Goodwin v. MTD Products, Inc., 232 F.3d 600, 606 (7th Cir. 2000); see also Mangren Research and Dev. Corp. v. National Chem. Co., Inc., 87 F.3d 937, 941 (7th Cir. 1996) (in a diversity case we apply the federal standard for judgment as a matter of law). We begin by examining whether, under Wisconsin law, 3M's operating procedures and manuals constitute a valid trade secret.

According to the Wisconsin Uniform Trade Secrets Act, a trade secret is defined as "information, including a formula, pattern, compilation, program, device, method, technique or process . . . [which] derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use . . . [and which] is the subject of efforts to maintain its secrecy that are reasonable under the circumstances." Wis. Stat. sec. 134.90(1)(c); see also ECT Int'l, Inc. v. Zwerlein, 597 N.W.2d 479, 482 (Wis. Ct. App. 1999). The defendants do not dispute that 3M has instituted elaborate security measures designed to maintain the secrecy of the material at issue. Rather, the crux of their argument is that the operating procedures and manuals encompass a broad category of items that are either of public knowledge, or relate solely to the manufacturing of carrier tape./2

Throughout the course of their argument, defendants press 3M to divulge what specific information contained within the more than 500 hundred pages of materials could be considered secret. In doing so, defendants seem to suggest that if 3M cannot point to specific items within its manuals that are not known by the industry, then 3M cannot claim a trade secret in the combined product. We disagree. In order to be considered a trade secret, a pattern, technique, or process need not reach the level of invention necessary to warrant patent protection. A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified

process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret. See Synthex Ophthalmics Inc. v. Tsuetaki, 701 F.2d 677, 683 (7th Cir. 1983).

There is no doubt that within the 500-plus pages of manuals at issue, there are a host of materials which would fall within the public domain. For example, 3M's instructions on how to clean the area around its machines, and how to properly assemble a cardboard box, surely cannot be considered independent trade secrets. Were 3M to bring Accu-Tech to court, claiming misappropriation on the basis that Accu-Tech was assembling ordinary cardboard boxes in a similar manner to 3M, we would not look favorably on such a claim. Yet, when all the cleaning procedures, temperature settings, safety protocols, and equipment calibrations are collected and set out as a unified process, that compilation, if it meets the other qualifications, may be considered a trade secret.

Contrary to defendants' suggestion, 3M is not attempting to preclude Accu-Tech from folding cardboard boxes. Rather, the company is seeking to prevent Accu-Tech from using and disclosing a process which it took the company six years and considerable income to perfect. These manuals and processes, even if comprised solely of materials available in the public domain, have been created by combining those materials into a unified system which is not readily ascertainable by other means. Thus, viewing the evidence in the light most favorable to 3M, we believe there was sufficient evidence to support the jury's finding that 3M has a trade secret in the operating procedures, quality manuals, trade manuals, process standards and operator notes for using 3M's equipment that makes resin sheeting.

Turning to the issue of misappropriation, we agree with the district court that there was sufficient evidence to support a powerful inference that defendants used 3M's operating procedures and manuals in establishing Accu-Tech's operations. While it took 3M six years and countless resources in order to make its carrier tape operation efficient and profitable, Accu-Tech was

able to almost immediately operate its resin sheeting line effectively. Furthermore, evidence adduced at trial established that there are significant similarities between 3M's carrier tape line and Accu-Tech's resin sheeting line, including the use of the same or similar equipment and materials. Moreover, testimony at trial suggested that Accu-Tech was disclosing to 3M customers and competitors processes detailed in 3M's manuals. As the district court stated, "[t]he inference is virtually inescapable that defendants gained a significant head start in their operation by using the trade secret knowledge they learned from plaintiff concerning the operation and standards for the line." We agree that when this evidence, along with all the reasonable inferences that may be drawn from it, is viewed in the light most favorable to 3M, it constitutes sufficient support for the jury's verdict. As such, we affirm the district court's denial of Accu-Tech's motion for judgment as a matter of law on the issue.

## 2. Specificity of the Permanent Injunction

On February 9, 2000, the district court partially granted 3M's request for a permanent injunction. The court ordered that Accu-Tech and its founders were permanently enjoined from disclosing to any third party (1) the operating procedures, quality manuals, process standards, and operator notes for using plaintiff's equipment that makes resin sheeting; (2) plaintiff's customized resin formulations that enhance the sheeting and thermoforming capability of resin and give it properties needed in the electronic industry; (3) plaintiff's slitting technology and experiment results including the design and setup of slitters; and (4) plaintiff's winding methods used to compensate for variations in film calipher. However, contrary to 3M's request, the district court did not enter an order permanently enjoining the defendants from using 3M's operating procedures and manuals or customized resin formulation. Rather, the court decreed that once the defendants had paid the plaintiff $270,500 in partial satisfaction of the jury verdict (or provided security in an amount sufficient to assure full payment and subsequent

costs), defendants were free to use the two aforementioned trade secrets./3

On appeal, both parties assert that the district court committed error in its February 9 order. Accu-Tech and its founders, focusing on the court's injunction against disclosure of 3M's operating procedures and manuals, contend that the court's order is too vague, and thus does not comply with Fed. R. Civ. P. 65(d). For its part, 3M maintains that the court incorrectly relied upon defendants' payment of damages as justification for not permanently enjoining the defendants from using 3M's misappropriated trade secret--an argument we will address in Part B3. We review the district court's grant or denial of a permanent injunction for abuse of discretion. Knapp v. Northwestern Univ., 101 F.3d 473, 478 (7th Cir. 1996). Factual determinations are reviewed for clear error and legal conclusions are given de novo review. A factual or legal error may be sufficient to establish an abuse of discretion. Id.

The requirements for a valid injunction are found in Fed. R. Civ. P. 65(d), which provides, so far as pertinent here, that "[e]very order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." As the Supreme Court has noted, "the specificity provisions of Rule 65(d) are no mere technical require ments. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." Schmidt v. Lessard, 414 U.S. 473, 476 (1974). Thus, district courts must endeavor to strike a balance, framing orders that provide plaintiffs with the appropriate level of protection while still placing defendants on notice of the prohibited conduct. See American Can Co., 742 F.2d at 333.

The defendants here contend that the injunction against disclosure entered by the district court must be vacated because, as a matter of law, the terms are too vague to give them fair notice of the prohibited conduct. In so arguing,

Accu-Tech and its founders propound that 3M has not identified what information within the 500-plus pages of manuals it considers to be secret, and that much of the information contained in those pages is either generalized business information or information relating to the manufacture of carrier tape, rather than resin sheeting.

The problem of framing an appropriate order may be particularly acute in trade secrets cases, see id. at 332, and it for that reason that courts have often set aside trade secrets injunctions as failing to comply with Rule 65(d)'s specificity requirements, see, e.g., E.W. Bliss Co. v. Struthers-Dunn, Inc., 408 F.2d 1108, 1113-17 (8th Cir. 1969) (reversing, as too vague, an order enjoining defendants from "using or disclosing trade secrets and confidential technical information of plaintiff"); Brumby Metals, Inc. v. Bargen, 275 F.2d 46, 49 (7th Cir. 1960) (finding language in injunction that prohibited defendant from selling furniture incorporating plaintiff's design feature "as offered in the current sales literature of Schoolco, Inc., or any variation thereof" to be overly vague); cf. PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610, 619 (7th Cir. 1998) (district court's injunction ordering Sherwin-Williams to take full responsibility for the future remediation of the PMC facility remanded for redrafting because the term "full responsibility" was hopelessly vague). However, the challenges to the injunctions in those cases are very different from the challenge raised by the defendants here.

In this instance, the defendants do not truly find error in the scope of the injunction as protecting disclosure of items beyond that which has previously been determined to be the applicable trade secret. Rather, to the extent that defendants find fault with the district court's order, it is because they argue that 3M cannot have a valid trade secret in the operating procedures and manuals. We found that argument unpersuasive above, and simply because defendants have refitted it as a challenge to the district court's permanent injunction does not add any merit to it.

Here, the district court's order does

nothing more than prohibit the defendants from disclosing the trade secret. In its memorandum, the district court acknowledged that defendants had sought a more narrow injunction, identifying specific secrets not to be used. However, the court determined that, in part to curb "the misconduct and evasive action of defendant Pribyl," no opportunity for loopholes should be allowed. We agree with the district court's decision that more specificity in the injunction is not mandated. Rule 65(d) does not "require the impossible. There is a limit to what words can convey. The more specific the order, the more opportunities for evasion." Scandia Down Corp. v. Euroquilt, 772 F.2d 1423, 1431 (7th Cir. 1985). "If narrow literalism is the rule of interpretation, injunctions will spring loopholes, and parties in whose favor injunctions run will be inundating courts with requests for modification in an effort to plug loopholes." Schering Corp. v. Illinois Antibiotics Co., 62 F.3d 903, 906 (7th Cir. 1995) (internal citation omitted). Further, Rule 65(d)'s specificity requirement does not demand that the court issuing the injunctiondisclose the trade secrets in its order. See Synthex Ophthalmics, 701 F.2d at 683.

We are aware that certain materials falling within the trade secret are public information. However, we believe it sufficient protection against the fear of unfair surprise embodied in the cases discussing Rule 65(d)'s specificity requirement that injunctions are construed narrowly, with close questions of interpretation being resolved in the defendant's favor. See Schering, 62 F.3d at 906. As such, we cannot hold that the district court abused its discretion in granting this permanent injunction against disclosure.

3. Admissibility of Evidence

Subsequent to the conclusion of the liability phase of the trial, the parties debated whether certain exhibits would be provided to the jury to consider during deliberations. Specifically, Accu-Tech and its founders quarreled over two sections of 3M's business conduct manuals, exhibits 114 and 115, which 3M sought to introduce in support of its breach of loyalty claims. Exhibit 114,

entitled "Conflict of Interest Policy" states that "3M employees should not engage in activities that give rise to a conflict of interest or the appearance of a conflict of interest, without prior management approval." The policy defines a conflict of interest as any activity by a 3M employee that (1) is inconsistent with 3M's activities or business interests, or (2) could cause a reasonable person to believe that the employee's judgment might be adversely influenced. Furthermore, the policy provides examples of real and potential conflicts, which include operating a business outside of the employee's 3M responsibilities which is in conflict with any 3M business. Exhibit 115 likewise lists 3M's conflict of interest policy, and provides similar language to that contained in exhibit 114. The district court, over defendants' objection, found that the exhibits were relevant; a decision which Accu-Tech now challenges.

We review a district court's ruling on the admissibility of evidence for abuse of discretion. Aetna Life Ins. Co. v. Wise, 184 F.3d 660, 665 (7th Cir. 1999). However, a finding that a district court's admission of evidence did, in fact, constitute an abuse of its discretion does not automatically necessitate an altering of the district court's judgment. See United States v. Wimberly, 60 F.3d 281, 286 (7th Cir. 1995). Indeed, "[n]o error in either the admission or the exclusion of evidence . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice." Fed. R.Civ. P. 61; see Old Republic Ins. Co. v. Employers Reinsurance Corp., 144 F.3d 1077, 1082 (7th Cir. 1998). A trial judge's evidentiary errors satisfy this standard only if a significant chance exists that they affected the outcome of the trial. See Hasham v. California State Bd. of Equalization, 200 F.3d 1035, 1048 (7th Cir. 2000).

Accu-Tech and its founders argue that the admission of the provisions in 3M's business conduct manuals regarding operation of a business in competition

with 3M constitutes reversible error. Specifically, they asseverate that theadmitted portions were inadmissible as irrelevant, see Fed. R. Evid. 401, 402, and as unduly prejudicial and confusing to the jury, see Fed. R. Evid. 403.

In granting the defendants summary judgment on 3M's claim of breach of loyalty based on improper competition, the district court determined that the defendants did not breach their duty of loyalty with 3M merely by operating Accu-Tech, as Accu-Tech's sale of resin sheeting was not in direct competition with 3M's business (a ruling which 3M disputes). Thus, at trial 3M's breach of loyalty claim was limited to being predicated upon the misappropriation of 3M's time and resources by Accu-Tech's founders in the process of starting Accu-Tech while still working for 3M. Given that the district court did not permit 3M to introduce evidence to the jury suggesting that Accu-Tech had competed with 3M, Accu-Tech asserts that the sections of 3M's manuals dealing with the operation of a business in competition with 3M were irrelevant. Furthermore, Accu-Tech maintains that the admission of those manuals may have unduly prejudiced or confused the jury into ignoring the relevant standard of law, and instead finding the defendants guilty of breach simply because they had violated 3M's conflict of interest policy.

We disagree with defendants that the district court erred in admitting 3M's conflict of interest policies. Certainly, given the court's decision that Accu-Tech's founders did not breach a duty of loyalty to 3M by forming their company, the manuals were not relevant (at that juncture) towards proving any theory of liability based on improper competition by the defendants. However, 3M did not offer those manuals in order to prove that Pribyl, Skrtic, and Harvey had improperly competed with 3M. Rather, the company sought introduction of those materials to assist in proving that Accu-Tech's founders, who had used 3M's time and resources, had read 3M's policies and thus knew that their actions were not permitted. Hence, the introduction of 3M's manuals was necessary, and therefore relevant, in establishing the mens rea for the plaintiff's remaining breach of loyalty claim.

However, not all relevant evidence is admissible, and we recognize that the jury may have been confused by the conflict of interest standard articulated in 3M's manuals. In this instance, a strong argument can be made that the probative value of exhibits 114 and 115 was substantially outweighed by the prejudicial effect their admission might have had on the defense. Yet ultimately, Accu-Tech's Rule 403 argument cannot prevail. In suggesting evidentiary error, the defendants become entrenched in a Catch-22 from which they cannot extricate themselves. The basis for the defendants' claim here is that the admission of the exhibits was inconsistent with the court's instruction that the defendants did not breach a duty of loyalty by starting and operating Accu-Tech. However, it is that very instruction which precludes the defendants from establishing that any error actually resulted in harm. This is because, absent evidence to the contrary, we assume that juries follow a court's instructions. See United States v. Jones, 248 F.3d 671, 676 (7th Cir. 2001); Rodriguez v. Peters, 63 F.3d 546, 559 (7th Cir. 1995). Ergo, we must presume that despite any alternate standard of liability which the jury may have gleaned from examining exhibits 114 and 115, the district court's instruction that defendants did not breach their duty of loyalty by forming and running Accu-Tech operated to cure those misconceptions. Defendants have not presented any evidence which would justify abandoning the presumption that this jury has followed instructions, and our examination of the record has likewise failed to adduce any basis for doing so. Accordingly, we find that the district court's decision to submit exhibits 114 and 115 to the jury during their deliberations does not constitute reversible error.

B.  3M's Issues On Appeal

1.  Summary Judgment

On November 12, 1999, the district court granted summary judgment in favor of the defendants on 3M's claims that (1) Accu-Tech had tortiously interfered with defendant Skrtic's employment contract with 3M, and (2) Accu-Tech had engaged in unfair competition with 3M. On appeal, 3M asserts that the district court committed

error in granting the defendants summary judgment, and thereby dismissing these counts.

A district court may only grant summary judgment when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56. We review the district court's decision on summary judgment de novo, viewing all of the facts, and drawing all reasonable inferences from those facts, in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Garvin v. Armstrong, 236 F.3d 896, 898 (7th Cir. 2001). With this standard in mind, we turn to examine the two decisions of the district court on summary judgment.

a. Tortious Interference With Skrtic's Employment Contract
In disposing of 3M's tortious interference claim, the district court stated that "assuming that Skrtic had breached his employment contract with 3M by his actions in operating Accu-Tech, to suggest that he was induced to do so by the very corporation he created surely cannot follow." The court noted that Skrtic, as an officer and owner of Accu-Tech, was so intertwined with the company, that "arguing the corporation induced his breach is like arguing that he induced himself to breach." Relying on the Wisconsin Court of Appeals' decision in Wausau Medical Center, S.C. v. Asplund, 514 N.W.2d 34 (Wis. Ct. App. 1994), the court resolved that "[t]he corporate fiction [could not] be stretched that far."

3M asserts that the district court's reliance on Wausau was misplaced. While 3M acknowledges that a party to a contract cannot be held liable for tortiously inducing his or her own breach, see, e.g., Rao v. Rao, 718 F.2d 219, 225 (7th Cir. 1983), here, the company asserts that Accu-Tech is a legal entity separate and distinct from Skrtic the individual. Thus, according to 3M, it is possible that Accu-Tech, through Pribyl and Harvey, tortiously interfered with Skrtic's 3M employment contract. Hence, it propounds, the district court erred in granting the defendants summary judgment on this claim.

Whether it is possible for a corporate entity to have tortiously interfered with the employment contract of one of its founders may at times become an interesting inquiry./4 Tortious interference with a contract occurs when someone intentionally and improperly interferes with the performance of a contract between another and a third person by inducing or otherwise causing the third person not to perform the contract. See Wausau, 514 N.W.2d at 44. Certainly, one could envision a scenario where, when a limited number of individuals form a corporate entity, that one of the individuals, while taking part in the formation, was still distinct from the entity formed (and ambivalent) so that a tortious interference claim could be viable. However, we need not dwell on such abstract inquiries at this time. While the district did hold that the corporate fiction could not be stretched as to allow a finding of distinctness be tween Skrtic and Accu-Tech, the court also provided an alternative basis for granting Accu-Tech summary judgment on the claim. As the court stated in addressing the suggestion that Accu-Tech had induced Skrtic to breach his contract with 3M, "[t]his allegation is belied by the undisputed facts surrounding the formation of Accu-Tech. Skrtic and Pribyl conceived, created and own Accu-Tech for the purpose of conducting its present business with Skrtic as an officer and fiduciary . . . . The undisputed facts establish that Skrtic initiated his own actions and was not induced to do anything by the corporation he created." Though 3M argues that a tortious interference claim could legally have been maintained, it has not presented any evidence to suggest a disputed issue of material fact as to whether Accu-Tech actually caused Skrtic to breach his contract with 3M. Thus, even if such a cause of action could be viable against Accu-Tech, in this instance there was no evidence presented that would have properly allowed the claim to survive de fendants' motion for summary judgment. We therefore affirm the district court's dismissal of 3M's tortious interference with contract claim.

b. Unfair Competition Claim

In its complaint, 3M alleged that Accu-Tech competes with 3M's products and processes, and that Accu-Tech unfairly competed with 3M by hiring 3M employees with knowledge of confidential information and trade secrets, inducing those employees to breach their employment agreements with 3M and to use 3M's trade secrets against it. In its November 12 order, the district court granted summary judgment in favor of Accu-Tech, dismissing 3M's unfair competition claim. According to the district court, because Wisconsin law would not interpret "competition" so broadly as to encompass the relationship between Accu-Tech and 3M, 3M's unfair competition claim could not be grounded in that theory. After examining other possible bases for the unfair competition claim, the district court determined that "[t]o the extent that there is a claim for unfair competition [the] issues are identical to the trade secret and tortious interference claims." Thus, the court dismissed the unfair competition claim as being repetitive. On appeal, 3M challenges the decision of the district court. First, it asserts that the issue of competition was inappropriately decided on summary judgment. Second, the company contends that even if its unfair competition claim was duplicative, that is no reason to dismiss the claim at the summary judgment stage.

In determining that 3M and Accu-Tech were not competitors, the district court focused on the fact that 3M did not lose a single sale or customer to Accu-Tech during the course of defendants' employment with 3M. The court also noted that there existed a market for resin sheeting which Accu-Tech was free to enter into, and which 3M chose not to penetrate. While the court acknowledged that there was some customer overlap between the two companies, the court believed that "the companies were not offering competing products, except in a most indirect sense."

After reviewing the record in this matter, we conclude that the issue of competition was improperly resolved on summary judgment. The district court, relying on Zimmermann v. Brennan, 254 N.W.2d 719, 721 (Wis. 1977), stated that Wisconsin narrowly construes what constitutes competition by an employee.

In Zimmermann, the trial court had been faced with the question of whether a public relations firm which performed limited services in commercial arts and graphics should be considered a "competitive business" to a commercial art studio. The trial court determined that the operations were not in competition with one another, and the Supreme Court of Wisconsin affirmed. We must note, however, that the decision in Zimmermann was grounded to a large extent in the standard of review. The court acknowledged that whether two employers are engaged in competition is an issue of fact, such that if the trier of fact's conclusion is not contrary to the great weight and clear preponderance of the evidence, it must be affirmed. See id. at 720. According to the court, "[t]he evidence was in dispute, and the finding that Barkin-Herman was not a 'competitive business' was not the only possible finding in light of the facts adduced at trial, but we are satisfied that the finding made was sufficient under the standard of review." Id. at 721.

Had the issue of competition been decided by the jury at trial, the evidence relied upon by the district court here would no doubt be sufficient to withstand a motion for judgment as a matter of law. However, we are presented with this issue on appeal from a grant of summary judgment, where we review de novo, viewing the evidence in the light most favorable to 3M, whether there exists a genuine issue of material fact. In such a setting, we must conclude that there is such an issue. As an initial matter, the record contains facts which suggest that these companies were somewhat intertwined. As the court noted, there did exist some customer overlap between 3M and Accu-Tech. As a result of Accu-Tech marketing to 3M customers, companies that required carrier tape were presented with two options: (1) those companies could simply purchase the finished product from 3M, or (2) those companies could purchase resin sheeting from Accu-Tech and process their own carrier tape. Furthermore, 3M presented evidence that Accu-Tech was working in concert with another company which sold machinery to convert resin sheeting into carrier tape, and that Accu-Tech offered its customers advice on how to form pockets in their resin sheeting. Such

evidence seems to suggest cross-elasticity of demand, and contradict the finding that these entities were not in competition--thus creating a disputed issue of material fact.

Even assuming that the facts presented by the district court were not in dispute, we do not believe that those facts dictate that Accu-Tech was entitled to judgment as a matter of law. See Fed R. Civ. P. 56. For example, we find that whether there are distinct markets for resin sheeting and carrier tape is of little consequence to this competitiondetermination. While we do not dispute that there may be a submarket for resin sheeting, that does not preclude the fact that resin sheeting may be part of a larger market which includes carrier tape. As the Supreme Court has stated "within [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962) (internal citation omitted). For instance, while there may be a distinct market for cellophane, in which there are many competitors, that does not rule out cellophane from being part of a larger market which consists of cellophane and other flexible packaging material. See United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 394-95 (1956). "In considering what is the relevant market for determining . . . competition, no more definite rule can be declared than that commodities reasonably interchangeable by the consumers for the same purposes make up that 'part of the trade or commerce', monopolization of which may be illegal." Id. at 395; see also Brown Shoe, 370 U.S. at 325 ("[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it"). Morever, that determination of whether two products are reasonably interchangeable must be made in reference to price, as "[a]t a high enough price even poor substitutes look good to the consumer." Richard A. Posner, Antitrust Law: An Economic Perspective 128 (1976). While Accu-Tech is correct in its assertion that resin sheeting is not a perfect substitute for carrier tape, if the cost of purchasing Accu-Tech's

product and transforming it into carrier tape is comparable to the cost of purchasing 3M's finished product, then an argument that the products are reasonably interchangeable may be viable. However, in the absence of an analysis of the relevant market, and a more thorough inquiry into the relationship between the products, we cannot find that the issue of competition was properly dismissed on summary judgment.

The district court predicated its grant of summary judgment on the duplicative nature of 3M's unfair competition claim. We have determined that the issue of whether 3M's carrier tape and Accu-Tech's resin sheeting are competing products is a disputed factual inquiry, not appropriate for resolution via summary judgment. Thus, the possible competition between Accu-Tech and 3M provides a distinct, independent basis for 3M's unfair competition claim. Hence, assuming arguendo that it is appropriate to dismiss a cause of action on summary judgment as being duplicative-- an issue we will not weigh in on--here, there are no duplicative claims which warrant such a dismissal. As such, we must reinstate 3M's unfair competition claim, and remand the issue to the district court.

2. Misappropriation of 3M's Customized Resin Formulations

As noted above, the jury concluded that 3M had a trade secret in the "customized resin formulations that enhance the sheeting and thermoforming capability of resin and give it properties needed in the electronic industry." The jury also determined that the defendants had improperly used or disclosed or threatened to use or disclose that trade secret, and awarded 3M $83,000 in damages. In its motion for judgment as a matter of law, Accu-Tech and its founders renewed an argument that there was no basis for a rational jury to find that the defendants misappropriated any customized resin formulations. The district court, while resolving that the jury had a basis for finding a trade secret in the customized resin formulations, also held that there was no basis for finding misappropriation of any customized resin formulation.

In order to understand the basis for the district court's finding, a brief explanation of the resin sheeting manufacturing process is necessary. The process for making resin sheeting begins with a raw material called a resin pellet. Resin pellets are widely available in a myriad of different formulations. In perfecting its resin sheeting manufacturing process for making carrier tape, 3M expended significant resources in analyzing and experimenting with different types of resin pellets. Besides using these commercially available resin formulations, 3M independently developed one type of resin formulation--a formula for polystyrene resin. Polystyrene resins are general-purpose, high-impact and ignition-resistant resins that meet application needs across a broad range of market segments including the packing industry. In granting the defendants judgment as a matter of law, the district court determined that the only resin formula which could be considered a customized resin formulation was the polystyrene resin. However, the court noted that while the defendants did use a polystyrene resin for making resin sheeting, they used a commercially available polystyrene resin rather than plaintiff's customized formula. Thus, the court found that there was no rational basis for concluding that Accu-Tech had misappropriated 3M's customized resin formulation.

We review a district court's grant of judgment as a matter of law de novo. See Massey v. Blue Cross-Blue Shield of Ill., 226 F.3d 922, 924 (7th Cir. 2000). Under Rule 50, a court should render judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed R. Civ. P. 50(a). Especially after a jury has evaluated a case, we bear in mind that the question is not whether the jury believed the right people, but only whether it was presented with a legally sufficient amount of evidence from which it could reasonably derive its verdict. See Massey, 226 F.3d at 924. But there must have been more than a "mere scintilla" of evidence to support the verdict. When examining the record, we look at the totality of the evidence, and we view

that evidence and the inferences which may be taken from it in the light most favorable to the party against whom the judgment was granted. See id.

3M asserts that the district court erred in granting the defendants judgment as a matter of law. First, 3M notes that the defendants were operating Accu-Tech at the time that 3M was developing its polystyrene resin. Because Skrtic was responsible for the manufacturing of the polystyrene resin and admittedly had some knowledge of this customized resin formulation, 3M posits that the district court ignored evidence that permits a reasonable inference that the defendants used 3M's customized resin formulation. Second, 3M argues that the district court's decision ignores the fact that the jury's verdict could have been based on defendants' threat to use or disclose 3M's trade secret. Third, 3M suggests that the district court's decision that there could be no customized resin formulations simply because 3M bought its resin on the open market was in error.

We agree with the district court that no rational juror could have found that defendants used or disclosed 3M's formula for producing polystyrene resin. There is no dispute that Accu-Tech operated in secret while its founders were employed by 3M. There is also no disagreement that at that time, 3M was developing its own polystyrene resin formula, which Skrtic had some access to. Finally, it cannot be contested that the defendants did in fact use a polystyrene resin formulation in making their resin sheeting. Yet, we cannot draw from these facts a reasonable inference that Accu-Tech was using 3M's polystyrene resin formulation. First, while he did have access, there is no evidence that proves that Skrtic had knowledge of 3M's polystyrene resin formula. Furthermore, as the district court noted, the evidence at trial specifically established that Accu-Tech was not using 3M's polystyrene resin. The testimony presented explicitly revealed that while defendants were engaged in producing resin sheeting from a polystyrene resin, that they used a commercially available resin formula rather than 3M's customized formula. Against these undisputed facts, 3M's facts and the reasonable inferences that may be drawn from them do not amount to

a scintilla of evidence.

However, 3M is correct to point out that the district court did not address in its grant of judgment as a matter of law whether the defendants had threatened to use or disclose 3M's customized resin formulation. Yet, the district court's silence on this matter is of little import. While vacating the jury award for misappropriation, the district court left intact a permanent injunction prohibiting the defendants from disclosing 3M's customized resin formulations. Thus, even assuming that the defendants knew 3M's customized resin formulations, 3M is sufficiently protected against the threat of disclosure by the district court's injunction. See e.g., PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1268 (7th Cir. 1995); American Can, 742 F.2d at 329. In fact, 3M acknowledges that the company would only be entitled to injunctive relief to prevent the future disclosure of the misappropriated secrets. As such, the fact that the jury may have based its finding of liability on the threat of disclosure of 3M's trade secrets--a questionable assumption given the jury's award of monetary damages--would not mandate a reversal of the district court's decision.

Finally, we agree with the district court that 3M does not have a claim for misappropriation of a trade secret incustomized resin formulations for commercially available resin products. Simply because 3M expended significantresources in selecting from the market the proper resin formula for making its sheeting does not constitute that selection as a customized resin formulation. As the district court correctly noted, "[t]esting many products on the market to choose the one that meets particular needs does not make that product 'customized' in any reasonable sense of the word." To the extent that 3M now argues that it modifies the commercially purchased resin pellets by blending them in carbon, we find that fact does not assist 3M's claim. The purpose of blending carbon into a commercially purchased resin is to create a conductive polycarbonate resin. However, testimony at trial revealed that 3M does not make the conductive polycarbonate resin that it uses, but rather that it purchases it from an

outside source. More importantly, there is not even a scintilla of evidence to suggest that the defendants misappropriated 3M's blending method./5

Overturning a jury verdict is not something that should be done lightly. According to our civil justice system, as enshrined in the Seventh Amendment to the Constitution, the jury is the body best equipped to judge the facts, weigh the evidence, determine credibility, and use its common sense to arrive at a reasoned decision. As a reviewing court, we must be "particularly careful . . . to avoid supplanting [our] view of the credibility or the weight of the evidence for that . . . of the jury." Massey, 226 F.3d at 925. Here, even taking that generous standard of review into account, we agree with the district court that this claim flounders for lack of evidence. Thus, we affirm the district court's grant of judgment as a matter of law.

3. District Court's Failure to Enjoin Future Use of 3M's Trade Secrets

Lastly, we return to the district court's February 9 decision, which partially granted 3M's request for a permanent injunction. As noted above, the district court, in rendering its decision, relied upon the Fifth Circuit decision in Next Level Communications LP v. DSC Communications Corporation, 179 F.3d 244 (5th Cir. 1999), which held that when a plaintiff has been compensated for lost future damages, an injunction against future use would amount to imper missible double recovery. Here, the court resolved that the jury had assessed damages based on what it would have cost the defendants to independently develop the trade secrets at issue. Because, according to the district court, payment for the full cost of development of the secrets deprives defendants of any unjust enrichment that may have accrued from their misappropriation, it decreed that once the defendants had made (or guaranteed) such a payment, they were free to use the secret they had misappropriated./6

On appeal, 3M contends that the district court's ruling has ipso facto forced the company to sell its trade secrets to those who stole them from it. 3M argues that without an injunction against use,

the company is not protected from the future ongoing harm that may be caused by Accu-Tech's use of 3M's trade secrets. Further, to the extent that the district court based its decision on Next Level Communications, 3M asserts that the decision was incorrect. Thus, it requests that we remand this matter and direct the district court to modify the permanent injunction so as to forbid Accu-Tech's use of 3M's trade secret. Once again, we review the district court's grant or denial of a permanent injunction for abuse of discretion, analyzing conclusions of law under a de novo standard and factual determination for clear error. See Knapp, 101 F.3d at 478. Notwithstanding the above, we note that modification of a permanent injunction is extraordinary relief, and requires a showing of extraordinary circumstances. See Protectoseal Co. v. Barancik, 23 F.3d 1184, 1186 (7th Cir. 1994).

The purpose of a permanent injunction is to protect trade secret owners from the ongoing damages caused by the future use of trade secrets, rather than to compensate for those damages. See Gillen v. City of Neenah, 580 N.W.2d 628, 633 (Wis. 1998); Simenstad v. Hagen, 126 N.W.2d 529, 535 (Wis. 1964). As such, it would appear that 3M is correct that Accu-Tech's payment of monetary damages should have no impact on the court's decision to grant a permanent injunction against use. Cost of development damages assessed against a defendant do not address the future harm caused by continued use of misappropriated trade secrets.

Yet, in presenting its argument, 3M has overstated the importance of the district court's analogy to Next Level Communications, and understated the factual conclusions which truly propelled the court's determination. In Next Level Communications, the jury had awarded the plaintiff exorbitant damages for lost future profits on sales of switched digital video products containing trade secrets which the defendant had misappropriated. See 179 F.3d at 247. After trial, when the plaintiff moved for a permanent injunction against the defendant's future transfer or disclosure of the plaintiff's trade secrets, the district court denied the request, finding that the recovered monetary

damages rendered any such injunction a duplicative remedy. See id. 3M suggests that Next Level Communications is inapplicable to these proceedings, as the jury awarded damages compensating 3M for the cost of development of its misappropriated trade secret, rather than for future lost profits. Hence, the company maintains, the imposition of an injunction against use would not be a duplicative remedy, and that the district court has created a rule of law whereby companies can gain ownership of misappropriated trade secrets simply by paying the cost of development in damages.

We agree with 3M that the jury's cost of development award does not render the granting of a permanent injunction against use in this instance as a duplicative remedy. Unfortunately for 3M, the district court did as well. The court's reference to Next Level Communications was not included in order to suggest that the payment of any damages for misappropriation gives the misappropriator ownership of the trade secret./7 In fact, the payment of damages in this instance was largely irrelevant to the court's decision to deny the injunction against use. The court reliance on Next Level Communications was simply for an unexceptional analogy: that just as a plaintiff who has been compensated for lost future damages should not receive an injunction against permanent use, "[s]imilarly, when a plaintiff has demonstrated no actual damages nor a likelihood of future damages a permanent injunction enjoining use is inappropriate." In fact, had the court not mentioned Next Level Communications, the assertion that an injunction is inappropriate when there is no likelihood of future harm would have carried no less weight.

It is apparent that the district court's determination was not based on a legal rule established in the Fifth Circuit. Rather, the court denied 3M the permanent injunction it endeavored because the company had not established the likelihood of any future damages. That is a factual determination which 3M has not sufficiently disputed, and which, under our clearly erroneous standard of review, we cannot find to be in error. See Knapp,

101 F.3d at 478.

Yet, the above should not suggest that if monetary damages for lost profits are not sought or quantified, that a permanent injunction against future use cannot be entered. The loss of a trade secret cannot, in some instances, be measured in monetary damages. See, e.g., FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd., 730 F.2d 61, 63 (2d Cir. 1984). Oftentimes, this is because the greatest loss that results from a misappropriation is the loss of the right not to divulge a trade secret, regardless of price. As the Supreme Court has stated:

[t]he right to exclude others is generally one of the most essential sticks in the bundle of rights that are commonly characterized as property . . . [and] [w]ith respect to a trade secret . . . central to the very definition of the property interest. Once the data that constitute a trade secret are disclosed to others, or others are allowed to use those data, the holder of the trade secret has lost his property interest in the data.

Ruckelhaus v. Monsanto Co., 467 U.S. 986, 1011 (1984) (internal citations omitted). Here, 3M contends that an injunction should attach because it was deprived of its right not to sell its trade secret to the defendants. Without an injunction against use, 3M declares that Accu-Tech receives a benefit that it would not have absent its wrongdoing.

Once again, 3M has ignored the factual predicate of the district court's determination. Instead, 3M suggests that when a party has been found guilty of misappropriation, that party should be enjoined in perpetuity from using the misappropriated trade secret. However, to impose such a draconian rule would be to fundamentally alter the purpose behind the permanent injunction. An injunction is not a punitive tool, but rather a vehicle for preventing injury. See Gillen, 580 N.W.2d at 633. According to Wisconsin law, though a court may grant injunctive relief against a person who misappropriated a trade secret, the court should continue that injunction only for a period of time reasonable to eliminate commercial advantage which the person who

misappropriated a trade secret would otherwise derive from the violation. See Wis. Stat. sec. 134.90. "Once the defendant has discovered, or would have discovered, the trade secret without the misappropriation, any lost profits from that time forward are not caused by the defendant's wrongful act." Sokol Crystal Products, Inc. v. DSC Communications Corp., 15 F.3d 1427, 1433 (7th Cir 1994).

In this instance, the district court made a factual determination that Accu-Tech would have been able to independently develop 3M's trade secret in a period of less than two years--a conclusion which 3M does not dispute. Given that Accu-Tech's founders were the individuals responsible for creating the materials for 3M in the first place, it would be nonsensical to suggest that they would not have been able to duplicate the materials on their own. As such, by the time the district court was faced with determining whether to enjoin Accu-Tech's use of 3M's trade secret, the court believed that Accu-Tech would have discovered 3M's trade secret. Hence, the district court properly determined that once payment to 3M had been made to alleviate any commercial advantage, there would be nothing further gained by enjoining Accu-Tech from using the trade secret which they would have by that time developed. While 3M is correct that Accu-Tech was able to develop its resin sheet ing line with more celerity as a result of its misappropriation, we believe, as the district court did, that the juryfactored in that monetary benefit in its award to 3M, thereby negating (as best as possible) any commercial advantage which Accu-Tech's iniquity parented. Giving the appropriate deference to the conclusions of fact made by the district court, we do not believe that the court abused its discretion in not granting 3M a permanent injunction against use./8

III. CONCLUSION

For the foregoing reasons, we Affirm the decisions of the district court on all counts, except that we Reverse and Remand the district court's grant of summary judgment to Accu-Tech on 3M's claim for unlawful competition.

FOOTNOTES

/1 The jury also determined that 3M had a trade secret in its slitting technology and experiment results including the design and setup of slitters, and in its winding methods used to compensate for variations in film calipher. However, the jury did not find that any of the defendants had improperly used or disclosed, or threatened to use or disclose either of these trade secrets.

/2 Because the purpose of trade secret law is to encourage innovation and development, protection should not extend beyond the limits needed to protect genuine trade secrets. See American Can Co. v. Mansukhani, 742 F.2d 314, 329 (7th Cir. 1984). The umbrella of trade secret classification should not be deployed to suppress legitimate competition. Id. As such, the plaintiff must do more than direct the court to a broad area of technology and assert that something there must have been secret and misappropriated. The plaintiff must point to concrete secrets. See Composite Marine Propellers, Inc. v. Van Der Woude, 962 F.2d 1263, 1266 (7th Cir. 1992).

/3 As for the plaintiff's trade secrets in slitting technology and winding methods, the district court permanently enjoined the defendants from making use of those secrets.

/4 While not crucial to the disposition of this matter, we note that under Wisconsin law, the elements of a tortious interference with contract claim are: (1) the plaintiff had a contract or prospective contractual relationship with a third party, (2) the defendant interfered with that relationship, (3) the interference was intentional, (4) a causal connection exists between the interference and the damages, and (5) the defendant was not justified or privileged to interfere. See Dorr v. Sacred Heart Hosp., 597 N.W.2d 462, 478 (Wis. Ct. App. 1999).

/5 3M urges this Court that the jury's verdict should not be overturned on insufficiency of evidence grounds, given the fact that the district court determined that the defendants had engaged in spoliation of evidence. At the heart of 3M's claim lies the fact that the evening before Pribyl was to turn over his computer pursuant to a discovery request, six gigabytes of music was downloaded onto his hard drive. This enormous volume of data consisted of the same songs being recorded multiple times in a short time span. While defendants argued that the spoliation was conducted by Pribyl's children who use the computer, the district court instructed the jury that they could draw a negative inference from the act of destruction. 3M maintains that by overturning the jury verdict on the basis

of lack of evidence, the court below negated its instruction and rewarded defendants for their spoliation.

We find the downloading of six gigabytes of music files onto Pribyl's hard drive on the eve that it was to be turned over for examination troubling, and his proposed justifications difficult to accept. Discovery is a meaningful part of our adversarial system, and were parties to circumvent discovery requests by selectively destroying potentially damaging information, the process would become ineffectual. There is no doubt that the district court was correct in giving a negative inference instruction, and that it could have rightly imposed sanctions on Pribyl. However, the fact that hard drive space was destroyed on Pribyl's computer does not relieve 3M of having to prove the elements of its claims. 3M has not suggested how the evidence it believed it would have received from the computer would have impacted its misappropriation claim. Without at least some suggestion that the computer contained information which would have assisted 3M's claim, we cannot allow 3M to prevail on any claim for which there was insufficient evidence. Furthermore, we recognize that the district court was in a unique position to examine the impact that any spoliation may have had on 3M's claims. The court, while aware of the spoliation, was still comfortable in determining that there was insufficient evidence to support 3M's claim. Sitting as a court of review, we do not dispute that determination.

/6 Originally, the district court had not enjoined Accu-Tech from using 3M's customized resin formulations. However, in light of the district court's decision on motion for judgment as a matter of law that the defendants had not misappropriated 3M's trade secret is customized resin formulations, the district court, as part of its April 3 order, added customized resin formulations to the list of trade secrets which Accu-Tech was forbidden to use (as well as disclose). Thus, the only 3M trade secret which Accu-Tech can use as a result of the district court's orders is the company's trade secret in the operating procedures and manuals.

/7 Such a system would encourage parties to bypass the market and misappropriate trade secrets, knowing that if caught, the party would merely have to pay the amount it would have had to negotiate for in the first instance. Though we do not read the decision in Next Level Communications to establish such a regime, to the extent that the opinion can be interpreted to do so, we reject that logic.

/8 We note in closing that, contrary to 3M's assertion, Accu-Tech, as a result of the district court's decision, has not simply bought the trade secret that it misappropriated. By its malfeasance, Accu-Tech was surely able to acquire 3M's trade secret with greater rapidity than it otherwise would have. But as a result, not only has Accu-Tech been forced to repay 3M the cost of development, but it has been permanently forbidden from acquiring complete ownership over those trade secrets. Within the bundle of rights commonly characterized as ownership of property also lies the right to transfer ownership. That stick in the bundle is no less essential than the right to exclude others. Yet, as a result of the district court's order, which Accu-Tech has not challenged on appeal, Accu-Tech is forbidden from disclosing 3M's trade secret to any third party, despite the court's finding that the company could have independently developed 3M's trade secret. Thus, far from leaving 3M with no protection against the future harm caused by Accu-Tech's misappropriation, the district court's decision has provided 3M with a blanket of protection that it would not have received otherwise.