Filed 5/3/21  SoCal Diesel v. Extrasensory Software CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SOCAL DIESEL, INC.,<br><br>　　Plaintiff and Appellant,<br><br>　　v.<br><br>EXTRASENSORY SOFTWARE, INC., et al.,<br><br>　　Defendants and Respondents. | B290062, B293020<br><br>(Los Angeles County Super. Ct. No. BC597857)<br><br>PUBLIC—REDACTED VERSION OF OPINION<br><br>Redacts material from sealed record.[*] (Civ. Code, § 3426.5; Cal. Rules of Court, rules 8.45, 8.46(f)(1) & (f)(2).) |

---

[*] This case involves material from a sealed record.  In accordance with Civil Code section 3426.5 and California Rules of Court, rules 8.45, 8.46(f)(1) and (f)(2), we have prepared both public (redacted) and sealed (unredacted) versions of this opinion.  We hereby order the unredacted version of this opinion sealed.

APPEAL from orders of the Superior Court of Los Angeles County, David Sotelo, Judge.  Reversed and remanded with directions.

Hacker Law Group, Jeffrey A. Hacker and Kristen E. Green for Plaintiff and Appellant.

Karish & Bjorgum, A. Eric Bjorgum and Marc Karish for Defendants and Respondents.

—————————————————

SoCal Diesel, a manufacturer of devices that communicate with computers on truck engines, sued Extrasensory Software, a competitor, and Ira and Robyn Emus, its principals, for trade secret misappropriation, alleging defendants stole an algorithm used in SoCal's products.  After presentation of the plaintiff's evidence, the court granted nonsuit as to Robyn, finding no evidence supported the allegation that she misappropriated any trade secret.  After a jury verdict in favor of SoCal, the trial court granted Extrasensory's and Ira's motion for new trial, finding no evidence suggested the algorithm in their product was (1) similar to SoCal's algorithm or (2) wrongfully acquired.

We conclude the court improperly granted a new trial, as no reasonable fact finder could conclude from the evidence that defendants' algorithm was not substantially similar to SoCal's, nor that it was reverse engineered by proper means.  We further conclude nonsuit was improperly granted as to Robyn, whom evidence suggested oversaw Extrasensory's operations and knew that Ira had misappropriated SoCal's algorithm.  Accordingly, we reverse the court's orders and remand the matter with directions to vacate nonsuit and consider defendants' other grounds for new

2

trial, and if none pertain, reinstate the jury verdict and conduct further proceedings consistent with this opinion.

## BACKGROUND

### A. The Trade Secret

A modern truck engine is controlled by a computer, called an Engine Control Module (Control Module), which receives signals from sensors throughout the vehicle, interprets them, and uses the results to communicate with actuators that adjust such factors as ignition timing, air-fuel ratios, and idle speed. The Control Module thus "tunes" the engine, while it is running, to meet desired performance and emissions goals. Embedded software in modern Control Modules is complex and sophisticated, able to monitor and regulate hundreds of parameters to optimize performance.

The group of settings necessary to achieve a particular performance profile is called a "tune."

A Control Module can be accessed by way of an "Onboard Diagnostics" (OBD) port under the driver's-side dashboard. A mechanic can attach a cable between the OBD port and a personal computer to receive information from and convey commands to the Control Module.

Data streams to and from the Control Module may be intercepted by a "can analyzer," which gathers the data in binary (1's and 0's) or hexadecimal form.

The performance and emissions goals established by a truck manufacturer are achieved by the "stock" tune, which the manufacturer pre-programs into the Control Module before it leaves the factory. Because an engine must meet various environmental, fuel-use, and longevity standards, the stock tune is relatively conservative.

But some modern Control Modules can be reprogrammed by truck owners.

An owner who has modified an engine with nonstandard equipment—for example a turbo- or supercharger, or high performance spark plugs or fuel injection—or who wishes to operate the vehicle in nonstandard conditions—such as in racing, towing, or offroading—may desire a tune different from the stock tune.

SoCal manufactures diesel racing parts, assembles racing engines, and distributes competition performance vehicle parts. It manufactures the Cummins Engine CSP5 Switch (the Switch), an accessory that reprograms the Control Module of Cummins diesel engines such as those found on late model Dodge Ram trucks. The Switch attaches to a truck's dashboard and can hold up to five tunes. The user reprograms the Control Module with any of the tunes simply by turning a knob.

The Switch employs software (CSP5 or EFILive software) created by and licensed from EFILive Limited (EFI), which can reprogram a Control Module to implement any one of five preset tunes. The software exists not only on the Switch, but must also be installed on the user's personal computer **[REDACTED]**. Before the Switch can reprogram the Control Module, it must initiate an identification algorithm that causes the module to recognize the Switch user as an authorized tuner. Without this authorization, the Control Module will be "locked," i.e., will reject any switching attempt.

That identification algorithm is the trade secret alleged here.

The identification algorithm "unlocks" the Control Module by **[REDACTED]**.

**[REDACTED]**

(At the time of trial, EFI had licensed only two CSP5 ID Codes, one to SoCal and one to Starlite Diesel, which is not a party here. Starlite's device operates similarly to SoCal's, but uses a mobile device rather than a Switch.)

In the first step of the algorithm, **[REDACTED]**.

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**. If it corresponds with **[REDACTED]**, the Switch will be recognized as an authorized input device, and the Control Module will accept its tunes.

Another EFI device, called an "AutoCal," can also retune a Control Module using EFI CSP5 software. This device is in the nature of a thumb drive, designed for those users who prefer that tunes be developed by technicians away from the user's vehicle and then sent to the user.

SoCal identifies as its trade secret the combination of the algorithm, including its methods and the values (constants) it uses to compute **[REDACTED]** values, and its (SoCal's) ID Code.

Defendants identify this as "Algorithm 1," and a similar algorithm possessed by Starlite Diesel as "Algorithm 2," which differs from Algorithm 1 only in that it has a different **[REDACTED]** user ID Code. **[REDACTED]**

Although defendants' algorithm needs no **[REDACTED]** ID Code, defendants concede that they **[REDACTED]** SoCal's ID Code into each of their switches.

5

**B.    The End User License Agreement**

Using any device with CSP5 software requires that the software first be installed on a PC.  Before a user can install CSP5 software on a PC, he or she must accept an End User License Agreement (EULA) by selecting the "I Do Accept" option displayed at the beginning of installation.

The EULA prohibits use of CSP5 software and any connected device for purposes of decompiling, accessing or otherwise reverse engineering the CSP5 algorithm.  The agreement provides:  "By connecting the EFILive software to any electronic control module, you confirm that you have read and agreed to the EFILive Terms and Conditions.  [¶]  If you do not agree with the EFILive Terms and Conditions, you must not use the EFILive software to connect to any electronic control module."  It provides that the user may not "modify, reverse engineer, decrypt or decompile the EFILive software or configuration files, or any part of them."

When an AutoCal is sold to a technician, the EULA will pop up on the technician's computer screen during installation.  When the technician sends the tuned AutoCal to an end user, however, the EULA will not follow.

EFI assigned its rights to enforce the EULA to SoCal.

**C.    Alleged Misappropriation of the Trade Secret**

Ira and Robyn Emus were the sole officers, directors, shareholders, and employees of Extrasensory, which like SoCal manufactures tuning accessories for diesel engines.  Both were formerly authorized sellers of EFI devices, but the relationship ended acrimoniously in 2012.

In 2014, defendants began manufacturing and selling switches that defeated the EFI software lock.

**D.    Litigation**

On October 14, 2015, SoCal sued Ira, Robyn, and Extrasensory for misappropriation of trade secrets (and other claims) under Civil Code section 3426, alleging they misappropriated the Switch algorithm.  After summary adjudication of some claims, the matter went to jury trial only on this claim.

At trial, SoCal presented evidence that Robyn ran Extrasensory's operations, while Ira was its technical expert.  Robyn knew about the EULA through her tenure as an EFI distributor, and planned with Ira to acquire and use SoCal's algorithm.  Specifically, Robyn testified that defendants' switch needed EFI's code to operate, and that EFI's altering its software in 2013 caused their prototype switch to cease working.  She had written, "There is no way to screw with our switch functionality and not also screw with [SoCal's Switch]," and testified that she knew that defendants' switch used SoCal's ID Code.  Robyn testified, "They had changed the protocol, in my opinion, when they realized that we knew how to do it.  So they changed it and then Ira figured it out again."

Ira testified that in 2013 he **[REDACTED]**, and advertised on Craigslist for a "hacker" to help him **[REDACTED]** derive an algorithm that would overcome the EFI software lock.  That effort proving fruitless, Ira placed another ad on an international job Web site for engineers and programmers, and over the next months interviewed several individuals until he found Pavel Simonov, a programmer based in Russia, to whom he sent the same information.  Simonov agreed to "reverse engineer" the software for $5,000, and was ultimately successful.  (The parties characterize Ira's efforts as "reverse engineering."  We utilize this

7

terminology for purposes of the appeal, without deciding whether it is accurate.)

Ira modified and incorporated Simonov's algorithm into switches he then manufactured and sold.

It was undisputed at trial that Ira's algorithm caused his switch to **[REDACTED]**, just as SoCal's algorithm did (although in Ira's switch, this number was calculated from the ID Code rather than **[REDACTED]**), employed the same **[REDACTED]** SoCal's algorithm used, **[REDACTED]**.

Ira admitted his efforts required decompiling EFI's intellectual property, which was subject to the EULA, which prohibited decompiling or reverse engineering. When asked whether his efforts violated the EULA, he responded, "no one has ever respected the end user license agreement." When asked a second time, Ira responded, "the EULA was never enforced. In all my years of working with EFILive, the EULA was never enforced."

After SoCal rested its case-in-chief, the trial court granted Robyn's motion for nonsuit, finding that no evidence suggested she participated in or had reason to know about any misappropriation of SoCal's algorithm. Because she had no understanding of computer programming, she could not know that the algorithm was misappropriated as opposed to reverse engineered. The court found it "inherently improbable that [Robyn] committed any act directly or indirectly[,] implied or tacit[,] that would subject her to personal liability . . . ." The court further found that SoCal's maintenance of the action against Robyn was in bad faith, and granted her motion for fees and costs, awarding $198,485.24.

The court denied Ira's and Extrasensory's motion for nonsuit.

Ira testified he has never known the content of SoCal's algorithm, even during trial.  He merely **[REDACTED]**.

Defendants presented evidence that Josh Chavez, a programmer from Arizona, independently reverse engineered the EFI software lock using an AutoCal, without using SoCal's algorithm, as did Dan Smith, defendants' computer expert. Smith and Josh Chavez both testified that defendants' algorithm was not similar to SoCal's, but instead functioned like the EFI algorithm operating on a Control Module, in that it could **[REDACTED]**.  (Smith testified that he reverse engineered SoCal's algorithm using only a pre-tuned AutoCal (and Control Module **[REDACTED]**), and never encountered the EULA.)

It was undisputed, however, that defendants' algorithm (1) used SoCal's user ID Code, even though it did not have to; (2) **[REDACTED]**.

Defendants' algorithm differed from SoCal's in that it employed different calculations and operations to ultimately obtain the same **[REDACTED]**.

Throughout trial, SoCal attempted to rely upon the EULA. However, the trial court undercut SoCal's efforts to do so by repeatedly ruling that the EULA could not "trump" or "govern over" California law, and issuing jury instructions to that effect.

On March 23, 2018, the jury returned a special verdict finding that Ira and Extrasensory misappropriated SoCal's trade secret, and awarded disgorgement of profits in the amount of $482,000.

Ira and Extrasensory moved for judgment notwithstanding the verdict (JNOV) and a new trial.

9

On June 14, 2018, the court denied defendants' motion for JNOV but granted the motion for new trial. It found that no substantial evidence suggested SoCal's switching algorithm "was the same as" defendants' algorithm.

The court found that whereas **[REDACTED]**. As a result, the court found, "[defendants'] switching algorithm would function with different [manufacturer IDs], something that [plaintiff's] switching algorithm would be unable to do. Put another way, plaintiff's switching algorithm is a **[REDACTED]**. . . . The switching algorithms were not simply different sets of instructions that would produce the same outputs for a given input. The algorithms were different in substance."

The court further found that "[o]ther than innuendo, no substantial evidence was presented that [defendants] 'misappropriated' or wrongfully obtained plaintiff's designated Trade Secret (the combined algorithm and manufacturer I.D.)." (Internal quotations omitted.) Instead, the evidence showed that Ira reverse engineered a "separate and distinct" algorithm, which is permissible. "Had Ira Emus simply misappropriated the relevant information given to him under the confidentiality agreement, there would have been no need to even attempt reverse engineering and, more importantly, the switching algorithms would have simply been the same."

SoCal appealed separately from the orders granting Robyn nonsuit and granting Ira's and Extrasensory's motion for new trial. We consolidated the appeals.

10

# DISCUSSION

## A.    New Trial

SoCal contends the trial court abused its discretion in granting defendants' motion for new trial.  We agree.

A new trial may be granted only on grounds specified in Code of Civil Procedure section 657, one of them being "Insufficiency of the evidence to justify the verdict."

"Trade secret" means "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d).)

Algorithms and computer code can be trade secrets. (*Altavion, Inc. v. Konica Minolta Sys. Lab., Inc.* (2014) 226 Cal.App.4th 26, 59.)  Software in a product remains a trade secret when it is not necessarily revealed during the product's use. (*Ibid.*)

 "Misappropriation" of a trade secret means "Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." (Civ. Code, § 3426.1, subd. (b).)

"Improper Means" includes theft, "inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  (Civ. Code, § 3426.1, subd. (a).)

However, "[r]everse engineering or independent derivation alone shall not be considered improper means."  (Civ. Code, § 3426.1, subd. (a).)

11

We review an order granting a new trial for abuse of discretion.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860.)  "[O]n appeal from an order granting a new trial upon the ground of the insufficiency of the evidence to justify the verdict . . . , such order shall be reversed as to such ground only if there is no substantial basis in the record" supporting it.  (Code Civ. Proc., § 657.)

"Thus, . . . an order granting a new trial under [Code of Civil Procedure] section 657 'must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory.' [Citation.]  Moreover, '[a]n abuse of discretion cannot be found in cases in which the evidence is in conflict and a verdict for the moving party could have been reached . . . .' [Citation.]  In other words, 'the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order.' " (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412.)  "The reason for this deference 'is that the trial court, in ruling on [a new trial] motion, sits . . . as an independent trier of fact.' [Citation.]  Therefore, the trial court's factual determinations, reflected in its decision to grant the new trial, are entitled to the same deference that an appellate court would ordinarily accord a jury's factual determinations.  [¶]  The trial court sits much closer to the evidence than an appellate court.  Even the most comprehensive study of a trial court record cannot replace the immediacy of being present at the trial, watching and hearing as the evidence unfolds.  The trial court, therefore, is in the best position to assess the reliability of a jury's verdict and, to this end, the Legislature has granted trial courts broad discretion to order new trials." (*Ibid.*)

Here, the trial court found that SoCal failed to establish either that defendants copied SoCal's algorithm or that they misappropriated as opposed to permissibly reverse engineered it. If supported by the evidence, these findings undermined the essential assertions forming the basis of the jury's verdict—that defendants obtained SoCal's trade secret by improper means—and therefore ostensibly provided a sufficient basis for ordering a new trial.

However, we conclude the record fails to support either finding.

Although Smith and Chavez opined that defendants' algorithm was not similar to SoCal's, what they in fact described was substantively identical. In Step One, **[REDACTED]**.

Defendants attempt to distinguish the manner in which Ira's and SoCal's algorithms **[REDACTED]**. But it was undisputed that Ira's algorithm would not work without **[REDACTED]**.

Only the specific operations employed to reach interim values were different. The initial values, end value, and all constants were the same, and both algorithms "functioned substantially the same way and accomplished substantially the same result." (*Sinclair v. Aquarius Electronics, Inc.* (1974) 42 Cal.App.3d 216, 222.)

Parties "cannot escape responsibility by showing that they have improved upon or modified plaintiff's process. Even though they may have modified or improved the plaintiff's process they are still wrongfully using its property." (*By-Buk Co. v. Printed Cellophane Tape Co.* (1958) 163 Cal.App.2d 157, 169; see also *American Can Co. v. Mansukhani* (7th Cir. 1984) 742 F.2d 314, 328-329 ["a party may not use another's trade secret, even with

13

independent improvements or modifications, so long as the product or process is substantially derived from the trade secret"].)

"One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form." (*Graver Tank & Mfg. Co. v. Linde Air Products Co.* (1950) 339 U.S. 605, 607.) "If the law were not flexible enough to reach such modifications, trade secret protection would be quite hollow." (*American Can Co. v. Mansukhani, supra*, 742 F.2d at p. 329.)

The jury was entitled to accept Smith's and Chavez's descriptions of the algorithms, but whether the algorithms were similar or dissimilar was an ultimate fact solely for the jury to decide.

We conclude the jury could not have found the algorithms were materially dissimilar.

No evidence was cited to support, and none supported, the trial court's conclusion that defendants' algorithm was robust enough to use different ID Codes **[REDACTED]**. On the contrary, the undisputed evidence from both sides established that defendants' switch used, and was required to use, SoCal's ID Code **[REDACTED]**.

Neither did evidence support the court's finding that Ira appropriated the trade secret by proper means. It was undisputed that installing CSP5 software on any Switch or other connecting device was subject to the EULA, which prohibited

14

decompiling or reverse engineering.  Ira also essentially conceded that he deliberately violated the EULA for the purpose of reverse engineering the CSP5 software.  He was asked twice at trial whether his efforts violated the EULA, and his only response was that "the EULA was never enforced."

Entering into a contract with the intention of breaching it constitutes fraud.  (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)

Civil Code section 3426.1 states that "Reverse engineering or independent derivation *alone* shall not be considered improper means."  (Civ. Code, § 3426.1, subd. (a), italics added.)  Use of the word "alone" indicates that reverse engineering attended by some delict is improper.

" 'The basic logic of the common law of trade secrets recognizes that private parties invest extensive sums of money in certain information that loses its value when published to the world at large.' [Citation.]  Based on this logic, trade secret law creates a property right 'defined by the extent to which the owner of the secret protects his interest from disclosure to others.' " (*DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 880.)  "By sanctioning the acquisition, use, and disclosure of another's valuable, proprietary information by improper means, trade secret law" "recognizes that ' "good faith and honest, fair dealing, is the very life and spirit of the commercial world." ' " (*Id*. at p. 881.)

Fraudulent violation of EFI's EULA, which expressly prohibited the very measures employed here and was designed to avoid the very result obtained, defeated EFI's (and by assignment SoCal's) efforts to protect its interest, and cannot be considered good faith and honest, fair dealing.  We conclude the deliberate

15

violation was an improper means by which to reverse engineer SoCal's algorithm. (See *Viken Detection Corp. v. Videray Techs., Inc.* (D.Mass. Jan. 7, 2020, Civil A. No. 19-10614-NMG) 2020 U.S.Dist. Lexis 2138, at pp. *10-11.)

Defendants argue the EULA is irrelevant because reverse engineering can never be an improper means of obtaining a trade secret. Untrue. As stated above, Civil Code section 3426.1, subdivision (a) provides that "Reverse engineering or independent derivation *alone* shall not be considered improper means." (Italics added.) Reverse engineering accomplished by fraud is not reverse engineering alone. Entering into a EULA with the intention of violating its terms is fraud.

Defendants argue that reverse engineering is proper where a rightful user is "examining or testing a product to determine whether it works." Perhaps so, but nothing suggests that was defendants' purpose here. On the contrary, defendants admittedly reversed engineered SoCal's algorithm in order to create their own competing product.

Defendants argue that SoCal's counsel characterized them as "cheaters" during opening argument, which inflamed the jury's passions, and in closing argument asserted that defendants violated the EULA, which misrepresented the law. Defendants argue a new trial is warranted because of counsel's misconduct. We disagree. Characterizing defendants as cheaters was no more inflammatory than SoCal's theory that defendants deliberately schemed to misappropriate its trade secret. An attorney " 'may vigorously argue his case and is not limited to "Chesterfieldian politeness." ' " (*People v. Fields* (1983) 35 Cal.3d 329, 363.) And as discussed above, counsel's characterization of the law was correct.

16

Defendants argue a new trial is warranted on the issue of damages because Chavez's independent reverse engineering of the SoCal algorithm vitiated some of SoCal's damages by reducing the period during which the algorithm was entitled to protection. We are in no position to reweigh the evidence on damages, and thus cannot from our vantage point order a new trial based on them. However, it not being clear from the record to what extent the trial court evaluated whether damages were excessive, (it having concluded that a new trial was required on other grounds), we will remand the matter with directions for the court to conduct such further proceedings as it sees fit.

**B.      Grounds for Nonsuit**

SoCal contends nonsuit as to Robyn was improper. We agree.

A motion for nonsuit tests the legal sufficiency of a plaintiff's evidence, operating, in effect, as a demurrer to the evidence. The motion lies when the plaintiff's evidence, taken as true and construed most strongly in favor of the plaintiff, entitles the plaintiff to no relief under any theory. (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214-1215.) In a proper case the court has the duty to forestall the cost and delay of a meritless lawsuit by granting nonsuit. (*O'Keefe v. South End Rowing Club* (1966) 64 Cal.2d 729, 746.)

A nonsuit motion may be made "[o]nly after, and not before, the plaintiff has completed his or her opening statement, or after the presentation of his or her evidence in a trial by jury." (Code Civ. Proc., § 581c, subd. (a).) The motion may be granted as to "some but not all of the issues involved in the action." (Code Civ. Proc., § 581c, subd. (b).)

17

Because a nonsuit deprives the plaintiff of the right to have a claim determined by a jury, California courts take a restrictive view of the circumstances under which it may be granted. (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838.)

In reviewing a judgment of nonsuit, we are "guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff. 'The judgment of the trial court cannot be sustained unless interpreting the [proposed] evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.' " (*Carson v. Facilities Development Co.*, *supra*, 36 Cal.3d at p. 839.)

An officer or director of a corporation may not use her position as an agent of the corporation to escape liability for "personally direct[ing] or participat[ing] in . . . tortious conduct" (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 504), but is liable to a third party "[w]hen [her] acts are wrongful in their nature" (Civ. Code, § 2343). Thus, "a corporate officer or director may be liable for an intentional tort" committed by the corporation at the officer or director's behest. (*PMC, Inc. v. Kadisha* (2000) 78 Cal.App.4th 1368, 1372.)

Here, Robyn testified that defendants' switch needed EFI's code, and consequently SoCal's algorithm, to operate, and that EFI's altering its software in 2013 caused their prototype switch to cease working. She testified, "They had changed the protocol, in my opinion, when they realized that we knew how to do it. So they changed it and then Ira figured it out again." Undisputed evidence thus established that Robyn planned with Ira to acquire and use SoCal's trade secret. She knew about the EULA through

her tenure as an EFI distributorship, knew that it prohibited reverse engineering of EFI's software, and knew defendants' switch could not be created without such reverse engineering. Robyn controlled Extrasensory's actions, and thus directly participated in the misappropriation of SoCal's trade secret.

A reasonable jury could have inferred from this evidence that Robyn understood that defendants' switch needed SoCal's algorithm, and ultimately worked only because it had it. She knew the algorithm could not be obtained without reverse engineering EFI's software, and controlled Extrasensory's actions in helping Ira to misappropriate SoCal's trade secret.

The court found, and defendants argue, that Robyn was not a computer programmer, and did not know what decompiling hardwired code entailed.

The point is irrelevant, because Robyn knew that the EULA prohibited decompiling EFI's hardwired code, no matter how it was accomplished.

Defendants argue that Robyn, at worst, believed the trade secret was acquired through reverse engineering, but "reverse engineering is expressly excluded from the definition of improper means." This argument has been discussed and rejected above.

**DISPOSITION**

The orders are reversed, and the matter remanded for further proceedings consistent with this opinion. Appellant is to receive its costs on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.

FEDERMAN, J.[†]

---

[†] Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.